## WRIGHT'S ADMINISTRATRIX V. THOMAS DONNELL.

1. Vindictive damages are not recoverable from the estate of a deceased trespasser, no matter how aggravated the trespass may have been.

2. A verdict will not be disturbed because the court below erroneously instructed the jury that they might allow exemplary damages, when it is apparent that compensatory damages only were given by the jury. (Fitzpatrick v. Blocker, 23 Texas, 552, cited by the court.)

3. Verdicts will not be disturbed because this court regards the evidence in the record as weak and contradictory, nor because it does not seem entitled to the weight accorded to it by the jury.

4. Objections to the charge of the court below to the jury should be taken in that court at the trial, and the proper charge be then asked.

5. The principle that no obligation will be implied to pay for services rendered by a son to a parent, a nephew to an uncle, etc., does not obtain as between a son-in-law and his father-in-law.

6. In a suit for the value of work, services, etc., done and rendered at various times from 1858 to 1866, verdict and judgment "in coin" were rendered for the plaintiff. *He'd*, that this was erroneous; but inasmuch as the defendant in error consents to the correction of the judgment in this respect, it is ordered to be so reformed, and to be affirmed.

APPEAL from Colorado. Tried below before the Hon. T. C. Barden.

A clear though compendious statement of the most important features and facts of this case will be found in the opinion of the court.

The items constituting the account of Donnell, the plaintiff, covered the series of years from 1858 down to 1866, both those years inclusive. They were of various kinds, but principally for building cabins, cribs, and shops; work on dwelling house, sawmill, and plantation; wages as manager and overseer, and value of plow animals furnished, aggregating $9,525 76.

The bill claimed against the plaintiff by the defendant in recon-

vention, was for the board of Donnell and his wife during the same period, for services of negro servants belonging to Wright and used by Donnell, and for money paid to and for Donnell by Wright, amounting to a sum total of $2950.

The plaintiff obtained a verdict and recovered judgment for $7,610 10 in coin.

The evidence in the record covers upwards of eighty pages, but in view of the rulings of this court, there is no occasion to undertake a review of it here.

The defendant moved for a new trial, which was refused, and she appealed.

The arguments of counsel are able and exhaustive, but space can be afforded for such portions only as seem of the most practical bearing and use.

*R. V. Cook*, for the appellant.—In the charges asked for by the plaintiff, and delivered by the district judge, it will be observed that he utterly abandons the express contract set up in his petition, and seeks to recover as upon an implied contract; and we find him obtaining a charge from the court to the effect that if he performed works and services for Wright, which were of value to him, if there was privity between the parties, the law would raise an implied obligation upon the part of Wright to make compensation. This, as a general principle of law, considered with reference to transactions between strangers, will not be called in question. But the appellant here enters her solemn protest against its applicability to the state of facts now before the court. The law as between persons standing related by consanguinity or affinity, does not raise any such implied promise. (Dye v. Kerr, 15 Barb., N. Y., 444.) The court will bear in mind that Mrs. Donnell, wife of the appellee, was the daughter and one of the immediate heirs of Dr. James Wright, who, according to the testimony of one of the witnesses, " was a weak and feeble old man."

Now it is contended for the appellant, that by reason of this relationship subsisting between Wright and Donnell, and in consideration of the further fact that appellee and his wife were inmates of Wright's family during the entire period within which the alleged services were rendered, the law will not raise an implied promise upon the part of Wright to pay his son-in-law. In other words, the law failing to raise any such promise as it would do if the parties were strangers, it devolved upon the plaintiff in the court below to show affirmatively that he was hired, and that Wright did actually promise to remunerate him for his services. The *onus probandi* rested upon the plaintiff. At this point we invoke the authority of Chief Justice Parsons:

"A nice distinction is taken in some cases between the presumptions which arise where service is rendered to a stranger and where it is rendered to near relations. In general, wherever service is rendered and received, a contract of hiring or an obligation to pay, will be presumed. But it is said not to be so when the service is rendered to the parent or uncle, or other near relation of the party, on the ground that the law regards such services as acts of gratuitous kindness and affection." (Dye v. Kerr, 15 Barb., N. Y., 444; Davies v. Davies, 9 Carrington & Payne; Parsons on Contracts, 44, fourth edition.)

It was for the recognition of this principle that the appellant strove in the court below. And a charge, embodying the principle, was asked and refused by the district judge.

Nor can it be successfully shown that the refusal of the district judge to give the charge was justified upon the ground that the principle contended for is not sanctioned by the authorities. This court is respectfully referred to the following cases determined by courts of the very highest respectability both in England and America. (Dye v. Kerr, 15 Barbour, New York, 445; Defrance v. Austin, 9 Pennsylvania, 309, Barr; Andrus v. Foster, 17 Vermont, 556; Fitch v. Peekham, 16 Vermont, 150; Guild

v. Guild, 15 Pickering, 130; Alfred v. Fitzjames, 3 Espinasse, 3; Weir v. Weir, 3 B. Monroe, 647; Osborn v. Governor of Guy's Hospital, 2 Strange, 728; Le Sage v. Coussmaker, 1 Espinasse, 188; Little v. Dawson, 4 Dallas, 111; Lee v. Lee, 6 G. & J., 309; Patterson v. Patterson, 13 Johns., 379; Little v. Dawson, 4 Binn., 111; Martin v. Wright's Administrator, 13 Wendell, 460; Davis v. Davis, 9 Carrington & Payne, N. P., 87; Parsons on Contracts, vol. 2, 46, and cases there cited.)

While the general principle contended for by the learned counsel for the appellee, that the law *per se* will raise and sustain an implied agreement upon the part of the party sought to be charged to pay for work and services rendered by a stranger for the benefit of himself or his property, is admitted to be correct, the point of divergence is this: that as between parties who are near relatives the law refuses to raise such a presumption; and that it is incumbent upon the plaintiff, in a suit of this character, not to rest his case upon the mere showing that the service had been rendered, but he is bound to go a step further, and to show affirmatively that the services were done and performed " under such circumstances as to justify an expectation on the part of both that pecuniary compensation would be required." The *onus probandi* is imperatively upon the plaintiff. See the case of Andrus v. Foster, 17 Vermont, 556; also King v. Sow, 1 B. & Ald., 179, where the court say: " Where parties are not related, it may be fairly presumed from a continuance in the service that the terms on which they continue were the same as during the preceding year. But where the relation of parent and child subsists, the ground for that presumption fails." And in the case of Dye and wife v. Kerr, *et al.*, 15 Barbour, (New York) 445, the court say: " The books are full of cases to show that, under such circumstances, the law will not imply a promise to pay for services thus rendered, or permit a recovery unless an express promise is shown, or something to prove that such was the expectation on both sides." And the

very question was then before the court that we are now discussing. And further on in the same opinion, the court say: "That during the whole time the services were being rendered, the family relation, which is always, in the absence of any express agreement or promise to pay, regarded as a bar to any right of recovery, existed between the testator and claimant."

And in Defrance v. Austin, 9 Pennsylvania R., 309, (Barr) the court say, in quoting the English authorities: "That the performance of labor generally by one for another raises an implied *assumpsit* that he will be compensated; but this implication may be rebutted by proof of circumstances showing that such a relation existed between the parties as repels the idea of contract. Indeed, the plaintiff in error confidently rests the whole question on the authority of the two cases last cited. And the attention of the court is especially invited to their consideration."

There being no evidence, then, of any express contract, and the law refusing, under the circumstances, to raise an implied one, the plaintiff below equally failed to elicit any facts to establish, circumstantially, that Wright was privy to the work done and performed by Donnell, or that the latter was in expectation of pecuniary compensation at the time the services are alleged to have been performed. The *onus* was upon him.

In James v. O'Driscoll, 2 Bay., S. C. Rep., 101, the court well say: "That all contracts must be good or bad in their original creation, and must not depend on subsequent contingencies." To the point that works and services originally gratuitous cannot be enforced as a subsequent pecuniary demand, the court is referred to these cases: James v. O'Driscoll, 2 Bay., 101; Bartholomew v. Jackson, 20 Johns., 28; Hurt v. Norton, 1 McCord, 22; Newell v. Keith, 11 Vermont, 214.

I cannot forbear quoting the syllabus of Bartholomew v. Jackson, as it expresses with great perspicuity the doctrine contended for: "Labor and services voluntarily done by one for another

without his privity or consent, however meritorious or beneficial it may be to him, as in saving his property from destruction by fire, affords no ground for an action."

But this is only affirmatory of the doctrine laid down in 2 Strange, 728, where the Court directed the jury: "That they should consider how it was understood by and between the parties at the time of doing the business; and that a man who expects a legacy cannot afterwards resort to his action." And Lord Kenyon, in 1 Esp., *nisi prius*, 189, said to the jury: "The law was well settled that, if the plaintiff had performed the services without any view to reward, but to a legacy, a demand for services could not be sustained." That the plaintiff below stood just in this attitude, is placed beyond the shadow of a doubt by his own express declaration !

The cases relied upon by the appellee below to shake this doctrine, so far from doing so, are relied upon by the plaintiff in error as authority in this court. In every case cited by the plaintiff below there was a promise upon the part of the person sought to be charged to make compensation. Thus, in Jacobson v. The Executors of La Grange, decided in New York in 1808, (*vide* 3 Johns. R., 199): "The parents of the plaintiff were about putting him to a trade in 1790, when the testator, who was his uncle, requested them to let him take the plaintiff as his own child, as he would do better for him than his parents could. The plaintiff was then about eighteen years old; and his parents, after some hesitation, consented to let him go and live with his uncle, who said that at his death he 'would do by him as his own child.'"

I need quote no further, for here was first a request upon behalf of the defendant that plaintiff should come to his (defendant's) house, and then an express promise that, if he did so, he should inherit a share of his property when the defendant died. No such case is now before the court.

So, also, of the case of Martin v. Wright's administrator, re-

lied upon with so much confidence by the learned counsel in the court below—there was a distinct and unqualified promise made by the party sought to be charged. Let us quote a paragraph: "The testator was gratified by the attentions bestowed upon him, and the services rendered for him by the plaintiff and his family, and expressed his intentions to make compensation for the same, by making provisions in his will for the children of the plaintiff, over and above the full share of their mother, to which she would be entitled as one of the children." (See the case reported in 13 Wendell, 461.). Here, then, it will be observed, there was a distinct and unqualified promise, on the part of the defendant, to make compensation for services which he appreciated, received and deemed valuable. It does not, then, control the case at bar, nor clash with the doctrine contended for by the appellant.

We now arrive at the consideration of another point made in the assignment of errors. The district judge charged the jury that they could, in their verdict, not only award to the plaintiff actual compensation for the works and services alleged to have been performed, or for any actual damages that he may have sustained, but that they might go beyond this estimate, and, in addition thereto, inflict exemplary or punitory damages. We think this charge was undoubtedly erroneous. "Damages are given as a compensation, recompense or satisfaction to the plaintiff for an injury actually received by him from the defendant. They should be precisely commensurate with the injury, neither more nor less; and this whether it be to his person or estate. Greenl. on Ev., vol. 2, § 253; Moore v. Anderson, 30 Texas, 230.

Without venturing to express any opinion respecting the merits of the celebrated debate between the author just cited and Mr. Sedgwick, as to whether in any event the jury can depart from the consideration of the injury received, and inflict upon the defendant a fine in the nature of vindictive damages or "smart money," (which Prof. Greenleaf says is at variance not only with

adjudged cases, but with settled principles of law,) it is sufficient for the case at bar to affirm that no such recovery can be had from the estate of a dead man!

Upon the theory contended for by Mr. Sedgwick, that the so-called "smart money" or vindictive damages is for the purpose of punishing the defendant, it would seem that the action thus far being of a personal character, ought not to survive the death of the offender. It is submitted that no enlightened court would do so monstrous a thing as to let fall the sword of judicial vengeance after the offender had passed from the theatre of human action, and was in the hands of his Maker. No clear adjudication going to this extent can be found in all the judicial decisions.

*Wm. Alexander, Wells Thompson* and *R. L. Foard*, for the appellee.—First—The appellant admits that if Donnell and wife are to be regarded in law as strangers to Dr. Wright, then Wright's obligation to pay for said work and labor is implied. But appellant contends that a "nice distinction" is taken in some cases between the presumptions which arise where services are rendered to a stranger, and when they are rendered to near relations. In general, whenever service is rendered and received, a contract of hiring or obligation to pay will be presumed. (Parsons on Contracts, vol. 1, 530.) Upon an examination of this question, we find that Judge Parsons himself is not positive that this "nice distinction" does exist; for he qualifies his opinion by saying, "but it is said not to be so when the service is rendered to the parent or uncle, or other near relative of the party, on the ground that the law regards such services as act of gratuitous kindness and affection. We find American authorities which recognize this distinction, and particularly when it grows out of the relation of parent and child," and he refers to the case of Andrews v. Foster, 17 Vt. R., 556. But it will be found that this case is entirely different from the one at bar. In Andrews v.

Foster, it was held that when a daughter continues to reside in the family of her father after the age of majority, the same as before, the law implies no obligation on the part of her father to pay for her services. And the same rule applies to cases where the person from whom the compensation for services is claimed took the plaintiff into his family when she was a child, to live with him until she become of age, and she continues after that time to reside in his family, he standing in *loco parentis* to her.

If she claim pay, it is incumbent on her to show that the services were performed under such circumstances as to justify an expectation on the part of both that pecuniary compensation would be required. The right to compensation for services in such cases must depend upon the circumstances of each particular case. (Fitch v. Peckham, 16 Vermont, 150; Weir v. Weir, 3 B. Monroe, 647; Alfred v. Fitzjames, 3 Espinasse, 3.)

Chief Justice Shaw thus sums up the law in Guild v. Guild, 15 Pickering, 130: "The point is whether, when a daughter, after arriving at twenty-one years of age, unmarried, continues to reside in her father's family performing such useful services as it is customary for a daughter to perform, and receiving such protection, subsistence, and supplies of necessaries and comforts as is usual for a daughter to receive in a father's family, the law raises any presumption that she is entitled to a pecuniary compensation for such services; and whether, after proving these facts, the burden of proof is on the defendant to show that the services were performed without any view to pecuniary compensation. Some of the courts are of opinion that as it is the ordinary presumption, between strangers, that upon the performance of useful and valuable services in the family of another, it is upon an implied promise to pay as much as such services are reasonably worth, so, after the legal period of emancipation, the law raises a similar implied promise from a father to a daughter. Other members of the court are of opinion, confining the opinion to cases of daughters

and expressing no opinion as to cases of sons laboring on the farm,
or otherwise in the service of a father, that the prolonged resi-
dence of a daughter in her father's family after twenty-one, per-
forming her share of the ordinary labors of the family, and re-
ceiving the protection and supplies contemplated in the supposed
case, may well be accounted for upon considerations of mutual
kindness and good will, and mutual comfort and convenience,
without presuming that there was an understanding or any expec-
tation that pecuniary compensation was to be made; that proof
of these facts alone, therefore, does not raise an implied promise
to make pecuniary compensation for such services, or otherwise
throw on the defendant the burden of proof to show, affirmatively,
that the daughter performed the services gratuitously, and without
any expectation of receiving wages or pecuniary compensation, but
with a view to the share she might hope to receive in the father's
estate or otherwise." The court were equally divided on this
question and did not decide it; but they were unanimous in the
opinion that in all such cases the question must be determined by
the jury, on all the circumstances, whether there was an implied
request for labor, and an implied promise of repayment or not.
(Guild v. Guild, 15 Pickering, 130.) It will be seen that the au-
thorities confine this " nice distinction " to females, remaining in
their father's family after the age of majority, and no case has
been decided where it applies to sons working on their father's
farms. Such is the effect of the ruling of all these cases; not
that the presumption of the promise to pay does or does not arise,
but that the matter is left entirely to the jury to find from the
evidence. The case now before the court is very different from
those in which the " nice distinction " is found. Mrs. Donnell was
not an unmarried female remaining with her father after majority,
but the wife of Thomas Donnell, the appellee, who was bound to
protect her, and who was entitled to her services and company.
She was entirely separate from her father's family, she and her

husband constituting a new family ; she was not entitled to pro-
tection or support from her father, and her allegiance was not due
to him, nor was she bound in law to live with or to work for him.

If Mrs. Donnell was not entitled to these rights from her
father, or bound to him by these obligations, how much less was
her husband, Thomas Donnell ?   There is another difference be-
tween this case and those cited by Judge Parsons, viz.: When Mrs.
Donnell married she left her father's house and protection, and
went with her husband to Corpus Christi, his home, and remained
there for the period of one year or more, after which she and her
husband returned to her father's house together.

We feel confident, then, that this "nice distinction," spoken of
by Judge Parsons, and claimed by appellant, does not exist in this
case, and that all the presumptions which arise in favor of
strangers for work and labor done, as to the obligation to pay,
arise in favor of Donnell.   In the case of Hatch v. Purcell, 1
Foster, N. H., 540, the plaintiff went to the defendant's house,
her near relation, without any understanding or agreement that
she should be paid for her services—took charge of the housekeep-
ing affairs, had the whole charge of the family for a number of
years—and there was no express promise on the part of the defen-
dant to pay for the services, made either before or after their ren-
dition.   She was, however, permitted to recover.   (Hatch v. Pur-
cell, 1 Foster, N. H., 540.)

In Jacobson v. La Grange, 3 Johns., 199, when a young man,
at the request of his uncle, went to live with him, and the uncle
promised to do by him as his own child, and he lived and worked
for him above eleven years, and the uncle said that his nephew
should be one of his heirs, and spoke of advancing a sum of
money to purchase a farm for him as a compensation for his ser-
vices, but died without devising anything to the nephew or making
him any compensation, it was held that an action on an implied
assumpsit would lie against the executors for work and labor per-

formed by the nephew for the testator.    (Jacobson v. La Grange, 3 Johns., 199.)

In the case of Patterson v. Patterson, 13 Johns., 379, the plaintiff, after he had come of age, lived with and worked for his father, the defendant, who said he would reward him well and provide for him in his will.    It was held that during the life time of the father the suit was premature.    But in delivering the opinion of the court the learned justice, Van Ness, remarked : " Should the defendant wholly overlook the plaintiff in his will, this would be such an act of injustice that there can be no doubt the plaintiff might maintain an action and recover a reasonable compensation for his services.    (Patterson v. Patterson, 13 Johns., 379.)    We thus have the cases " where services rendered to the parent or uncle, or other near relative of the party," on which Judge Parsons remarks : " it is said cannot be recovered on the ground that the law regards such services as acts of gratuitous kindness and affection," and from which the learned author deduces the theory that " nice distinction is taken in some cases between the presumptions which arise when service is rendered to a stranger and where it is rendered to near relations."    In these cases, then, it will be found that the presumptions that arise in favor of strangers do arise in favor of certain near relations, as sons working on the farms of their fathers, and are only confined in their operations to unmarried females, continuing after majority to reside in their father's family.

In the controversy between Mr. Sedgwick and Prof. Greenleaf, as to whether damages are given partly as a compensation to the sufferer, and partly as a punishment to the tortfeasor, or whether they are given as a compensation entirely, for the loss or injury sustained to the person or property, we think the weight of authority and reason is undoubtedly with the learned Professor, that damages are given as a compensation.    Then, if this be true, why should the action abate on the death of either party; especially

when a benefit has accrued to the estate of the wrong-doer? At common law, actions, when the declaration was *contra pacem* and the plea was "not guilty," were in the nature of criminal prosecutions, in which the courts held that the representatives could not be punished for the crimes of the dead; for all public and private wrongs were buried with the offender. Our Legislature doubtless intended that certain actions of this character, although actually arising *ex delicto*, should survive. *Vide* an act authorizing the heirs, representatives, or relatives of deceased persons, to sue for and recover damages when the death of such person or persons has been caused or occasioned by the negligence, culpable or wrongful act of another. (Paschal's Digest, article 15.) It will be observed by this act that where death ensues the action may be brought by the representatives, which will not abate on the death of either party. But should the plaintiff be only injured bodily, and bring his action for damages, and then during the pendency of the suit the defendant should die, the suit will abate. Suppose a person should be maimed by the negligence, culpable or wrongful act of the owner of a stage coach, and bring suit for damages, and during the pendency of the action the owner of the coach dies, upon the maxim *actio personalis moritur cum persona*, the suit would abate. But if the person had been killed instead of maimed, the death of the coach owner would not defeat the action of the representatives. In the first instance damages could not be recovered when most they should be given; but in the second place as a panacea for grief and not an actual need the courts will allow a recovery. And such would seem to be a literal construction of the statute, though we think the Legislature intended this act to cover all personal actions, and to do away with the common law rule of *actio personalis moritur cum persona*.

WALKER, J.—Donnell is the son-in-law of James Wright, deceased, whose wife is also dead. The appellant is the administratrix

and sole surviving child of Dr. James Wright. This suit was brought in the district court, after the death of Mrs. Donnell, and also of her brother Thomas, who died in 1864, Mrs. Donnell having died in 1865. Dr. James Wright is also dead, and Mrs. Gillespie, the appellant, is the survivor of the family. It appears that Dr. Wright had purchased a plantation upon which there was not much improvement; that Donnell had married his daughter, and for about fourteen months after his marriage resided at Corpus Christi, when, for some reason or other, which does not appear from the evidence (nor is it material to the case), he returned to his father-in-law's place with his wife, and appears to have made improvements, built several cabins, and assisted in building a dwelling house; and to have had the general superintendence and managment of the plantation. Mrs. Gillespie lived with her husband in Tennessee, and Thomas Wright was in the Confederate army from 1861 to 1864, when he died. The plaintiff sued for $9,525 76 of an itemized account, and claimed $5500 damages, and in the original petition set up an express contract, but appears to have abandoned this and sought to recover on an implied assumpsit. The defendant plead in reconvention, setting up an account by way of counter-claim. On the trial the jury gave the plaintiff a verdict for $7610. This was $1,915 76 less than the amount claimed upon account.

The court doubtless erred in charging the jury that they might give punitory damages, if they found that Wright had acted maliciously and deceitfully toward Donnell. Wright had died before the trial. In Rippey v. Miller, 11 Iredell, 247, it was held, that, in an action against the representative of a deceased, who had committed a trespass on the property of the plaintiff, the plaintiff cannot, no matter how aggravated the trespass may have been, recover vindictive damages.

On this point there has been some discussion between Professor Greenleaf and Mr. Sedgwick. The former contending that puni-

tory damages are intended as a personal punishment to the offender; the latter that the object should rather be a lesson to the public.    Whatever difference of opinion may exist as to the reason of the rule, we are of opinion that the rule itself is properly settled in Rippey v. Miller, and the instruction of the court was erroneous.    But to this verdict we must apply the rule laid down in Fitzpatrick v. Blocker, 23 Texas, 552.    The court say : If it appear that the verdict is not objectionable, as having been rendered for exemplary damages, but that merely compensatory damages have been given, the fact that the court erroneously instructed the jury that they might find exemplary damages, without any sufficient basis therefor having been laid in the petition, is not a ground for disturbing the verdict.    The verdict was for nearly two thousand dollars less than the amount of the plaintiff's itemized account.    The evidence, it is true, is somewhat weak, and contradictory as to several of the items, but verdicts must not be disturbed because we may not give to the evidence the same force and weight which the jury may allow to it.    (Latham v. Selkirk, 11 Texas, 321.)

The plaintiff in error urges strongly several objections to the charge of the court, and some of them apply with considerable force, but they should have been made at the time the charge was given, and the court asked to give the proper charge.    (See Farquhar v. Dallas, 20 Texas, 200 ; Powell v. Haley, 28 Texas, 52; Robinson v. Varnell, 16 Texas, 387.)

We do not think the court erred in refusing to give the charge as asked by the appellant's counsel.    We cannot adopt the doctrine claimed.    It is true that a rule has been maintained in many courts of high authority, that amongst near relatives, as between father and son, uncle and nephew, suits shall not be maintained for services which are rendered on the ground of natural love and affection, or in expectancy of a future legacy, inheritance or devise ; and the reason of the rule is that the party rendering the

services is generally more liberally rewarded for his services than he would be under an express contract or an implied assumpsit. But we do not think the relationship between father-in-law and son-in-law comes within this rule, and when the reason of the rule fails, the rule itself should cease. *Cessante ratione legis, cessat ipsa lex.* The rule would be one of great hardness if applied in this case. Donnell was the son-in-law of Wright; his wife was childless and insane. She died, terminating the family bond. His labor on Wright's plantation, as a mechanic and otherwise, may (and there is proof to show, did,) build up an estate for Wright. The daughter who inherits all was away in a distant State with her family; and, for all that is shown by the record, did nothing toward helping her father to accumulate a fortune. Her brother and sister died childless, and she is the sole heir to her father and to them.

The case has been ably contested. A jury has found a verdict which, we think, comes as near a fair settlement (or more so) as we could make between the parties.

The charges on both sides may have been extravagant, even unconscionable, but the jury have allowed for them. They heard the evidence from the mouths of the witnesses, and are the better able to give it the proper weight which belongs to it, and the errors of the court are not such as to entitle the plaintiff in error to a reversal.

But it was error to give a judgment for coin, and upon this the judgment would be reversed but for the offer of defendant in error that the judgment shall stand corrected and reformed in this particular, and in consequence of this error the plaintiff below will not be allowed interest on the judgment until sixty days from the issuing of the mandate of this court.

With these corrections the judgment of the district court is affirmed.

Reformed and affirmed.