MORRISS et al. v. BARTON.

No. 32564.    Sept. 23, 1947.

Rehearing Denied Jan. 27, 1948.

Second Petition for Rehearing Denied March 9, 1948.

*190 P. 2d 451.*

John R. Miller, L. O. Lytle, and Roy T. Wildman, all of Sapulpa, for plaintiffs in error.

Finch & Finch, of Sapulpa, for defendant in error.

RILEY, J. This action was commenced January 9, 1943 by Elizabeth Barton against S. W. Anthony to recover damages for willful destruction of production from an oil and gas lease and for negligent operation of the lease. The land was owned by plaintiff and leased to Anthony for the production of oil and gas.

On January 17, 1944, after answer was filed, defendant S. W. Anthony died. The action was revived as against the executors of his estate.

The land consists of the north 13.84 acres of lot 1, sec. 4, twp. 16 N., R. 12 E. in Creek county. On April 27, 1936, plaintiff executed and delivered to S. W. Anthony an oil and gas lease to the land. Production from a well in a shallow sand was reserved to lessor without right to drill to the lower formation. That well is not in controversy.

The leased land lies along the south side of the north line of twp. 16. The land is 80 rods in width and approximately 27 rods in depth. The township line between townships 16 and 17 N. is a correction line, so that 204.6 feet of the SE¼ SE¼, sec. 33, twp. 17 N., lies directly north of the east

204.6 feet of plaintiff's land. The other portion of plaintiff's land lies south of the SW¼ SE¼, sec. 33, twp. 17 N., known as the Bennie Gilcrease land. All of the NE¼, sec. 4, twp. 16 N., except the 13.84 acres owned by plaintiff, is known as the Upton tract.

S. W. Anthony owned the W½ and NE¼ of NW¼, sec. 3, twp. 16 N., known as the Whetstone tract, the north part of which lies directly east of plaintiff's land.

Sinclair-Prairie Oil Company, in 1936, held oil and gas leases to the Bennie Gilcrease land and the Upton tract. At that time, S. W. Anthony and C. D. Clingensmith, or Clingensmith Oil Company, held oil and gas leases to the Tom Gilcrease tract (SE¼ sec. 33, twp. 17) mentioned in the record as the Clingensmith lease. S. W. Anthony thereafter conveyed his interest in the Clingensmith lease to his brother, Frank A. Anthony.

Sinclair-Prairie drilled its Well No. 1 in April, 1936. It is located near the southwest corner of the Bennie Gilcrease land and 300 feet north and a short distance east from the northwest corner of plaintiff's land. Sinclair No. 1 entered the Wilcox Sand, found in formation at a lower depth. While Sinclair No. 1 was being drilled, plaintiff executed the oil and gas lease on her land to S. W. Anthony. The well so deepened by Sinclair-Prairie produced from the Wilcox Sand. Immediately thereafter S. W. Anthony drilled Barton No. 1 on plaintiff's land. It is located 250 feet east of the west boundary and 200 feet south of the north boundary. Barton No. 1 also produced from the Wilcox Sand.

Thereafter S. W. Anthony drilled Barton No. 2 near the center of plaintiff's land, and Barton No. 3, 240 feet west of plaintiff's east boundary. Sinclair-Prairie then drilled approximate offsets to each of the three Barton wells. Whereupon Anthony drilled Anthony No. 2 on the Whetstone lease as an offset directly east of Barton Well No. 3. This well is located 250 feet east of plaintiff's east boundary. He also drilled Anthony No. 1, a diagonal offset to the southeast, and later drilled three or four wells farther east on the Whetstone tract, owned in fee by Anthony. C. D. Clingensmith, or Clingensmith Oil Company, drilled well No. 1 on the Tom Gilcrease tract 500 feet north and slightly east of Barton No. 3, and later Wells 2, 3, 4, and 5 farther north and east on said tract were drilled. Sinclair-Prairie drilled three wells farther north on the Bennie Gilcrease land.

All the above wells produced from the Wilcox Sand until sometime in 1938. In that year all the Sinclair-Prairie wells on the Upton tract were plugged and Sinclair-Prairie surrendered its lease. Shortly thereafter the wells farther to the north and west, on the Bennie Gilcrease tract, were plugged, and on November 1, 1940, Barton No. 1 was plugged.

About April 16, 1940, at the direction of S. W. Anthony, his employees ran 90 or 93 sacks of quick-setting cement in Barton No. 3 well. This well had been drilled 20 feet into the Wilcox Sand. Cement so run sealed Barton No. 3, 11 feet above the oil producing stratum; it never thereafter produced. Barton No. 2 was pulled and plugged in the summer of 1943.

Plaintiff alleged that defendant Anthony owned the fee or oil and gas leases covering all the land surrounding plaintiff's land; that Wells Nos. 1, 2, and 3 on her land came in with higher initial production than any other wells drilled in that field; that the thickness of the sand was as great or greater in plaintiff's land than in any of the surrounding wells; that the porosity and saturation of the sand were equal to or better than in the surrounding wells; that within this small pool all of plaintiff's wells were on the high, thick, and most prolific portion of the structure and would have produced as much or more oil than any of the surrounding wells had they been properly

operated. Defendant Anthony, it is alleged, because of his ownership of land and leases surrounding plaintiff's land, was negligent and careless in equipping and operating wells on plaintiff's land and did not obtain therefrom maximum production, but did produce adjacent wells in an efficient manner so as to drain the oil from plaintiff's land. On April 1, 1940, it is alleged, defendant shut down Barton No. 3 and never thereafter produced any oil therefrom; that Barton No. 3 then had a potential capacity as high as the offset well to the east on defendant's land; that defendant's said offset well had, after April, 1940, produced approximately 71,000 barrels of oil of the value of $1.10 per barrel; and except for the closure of Barton No. 3 plaintiff would have received in royalty from it the sum of $9,787.50, but plaintiff was so defrauded in the amount stated.

Similar allegations were made with reference to Well No. 2; the amount of plaintiff's loss attributed to that well was alleged to be $8,455. Like allegations were made with reference to Well No. 1; the amount of royalty lost to plaintiff from that well was alleged to be $4,950.

Plaintiff further alleged that Anthony's acts were accompanied by a willful design to drain the oil from plaintiff's premises; that his conduct was gross and wanton. Plaintiff prayed for punitive damages in the sum of $10,000.

A motion to make an additional party plaintiff and to strike allegations from the petition was in part overruled; a part of the motion to make more definite and certain was sustained.

The petition was amended; motion to strike and demurrer to the amended petition were overruled.

Defendant answered and amended, and unsuccessfully renewed motions and sought to dismiss all of the action.

On January 31, 1944, suggestion of death of defendant, S. W. Anthony, was filed. The action was revived and amended as against the executors. The co-executors, as defendants, with leave, pleaded the statute of limitations as to the plugging of Barton No. 3, set up in detail ownership of the land and leases surrounding that of plaintiff and a detailed history of production from the field.

Defendants pleaded failure of plaintiff to present to the executors of the estate of S. W. Anthony within the time allowed by law any claim for damages. The proceedings cover 296 record pages.

A jury was waived and issues were tried to the court.

Trial commenced June 4, 1945. On October 11, 1945, the court filed findings of fact and conclusions of law. Defendant filed motion for new trial on October 13, 1945. On October 16, 1945, the court rendered judgment for plaintiff in the sum of $17,283.75 actual and $5,000 as punitive damages.

On October 17, 1945, defendants filed a second motion for new trial; both were overruled. Defendants appeal and present 149 specifications of alleged error.

Some of these assignments go to matters not occurring at the trial. Many of them were not presented to the trial court in either of the motions for new trial. For example, assignments Nos. 3 to 8, inclusive, relate to rulings of the court on motions and demurrers. These rulings were made long before the trial and are not mentioned in either motion for new trial. These are not errors occurring at the trial and may not be considered on appeal. Arnold v. Board of Com'rs, 124 Okla. 42, 254 P. 31; Johnson v. Alexander, 66 Okla. 128, 167 P. 989; Hulme v. Hill, 177 Okla. 485, 60 P. 2d 1042; School Dist. v. Crabtree, 146 Okla. 197, 294 P. 171; Bilby v. Gibson, 133 Okla. 196, 271 P. 1026. However, in view of the fact that plaintiff's motion to strike these and other assignments has been overruled, it is not

inappropriate to observe that the trial court did not err in ruling upon such matters not properly presented. Defendants present the remaining assignments singly and in groups.

The real issue is whether S. W. Anthony, lessee of plaintiff's land, owner of oil producing land and production adjoining, did sabotage or unnecessarily damage the production of the wells on plaintiff's land. If so, he was liable in damages. Donaldson v. Josey Oil Co., 106 Okla. 11, 232 P. 821.

The record contains evidence tending to prove the allegations of plaintiff's petition. According to the evidence Barton Well No. 3, located 240 feet west of the east boundary of plaintiff's land and 490 feet west of a direct offset on Anthony's land, shortly before April, 1940, was producing, or capable of producing, 90 or more barrels of oil per day. The wells on plaintiff's land were then being pumped independently. Anthony directed his employees, who were pumping the wells on the Barton lease and on the Anthony land, to slow down the rate and shorten the length of the strokes of the pump on Barton No. 3; one of the pumpers, Hiram Byard, told Anthony: "Well, you don't think I can get any oil that way do you?" to which Anthony replied: "Well, we don't want any oil, I will get it any how."

The evidence tends to show that Barton No. 3 was so operated until about April 16, 1940, at which time Anthony caused 90 or more sacks of quick-setting cement to be run in Barton No. 3; the well never produced thereafter. At that time all the wells on the south and west and nearly all the wells to the north and west of the Barton land had been plugged; drainage from the Barton land could only go to the east and northeast.

Anthony gave to Mr. Barton as his reason for running the cement into the well that it would shut off water in the well; that he intended to drill out the cement down to and into the producing sand and put the well back on production; but he never did so and Barton was never advised of his intention not to do so until 1943 when Anthony finally plugged the well. The well was plugged without notice to the lessor and contrary to the rules and regulations of the Corporation Commission.

Evidence tends to prove that Anthony No. 2, a direct offset to the Barton No. 3, continued to produce and increased production for a while after the cement was run in Barton No. 3, and that Anthony No. 2 was still producing 25 or more barrels of oil per day at the time of the trial, five years after Barton No. 3 was cemented.

The evidence tends to prove that after Sinclair-Prairie plugged its wells and surrendered its lease on the Upton tract to the south and west of plaintiff's land, and after Barton No. 3 was cemented, the owner of the Upton land drilled a well to the Wilcox Sand, located only 45 feet from the southeast corner of plaintiff's land; this well produced on an average of eight or nine barrels of oil per day and was capable of producing 15 barrels when properly equipped; it was producing 15 barrels per day, when operated, at the time of the trial.

Defendants contend that the evidence as to the production of Barton No. 3 and Anthony No. 2 was incompetent because the witnesses who testified were not qualified as experts. The contention is without merit. All these witnesses were shown to be experienced in the production of petroleum. Most of them had had from 10 to 25 years' actual experience in the production, pumping, and operating of wells. They were qualified to testify concerning such matters. Howerton v. Kan. Nat. Gas Co., 82 Kan. 367, 108 P. 813; Culbertson v. Iola Portland Cement Co., 87 Kan. 534, 125 P. 81. This evidence tends to prove that S. W. Anthony designedly destroyed Barton No. 3 on plaintiff's land.

Shortly before Barton well No. 3 was slowed down, according to testimony of two of his former employees, and before Barton No. 3 was cemented, S. W. Anthony made an effort to purchase in fee all the Barton land; Barton refused to sell; Anthony thereafter made statements to other parties that he would make Barton sorry. Charles Tuttle, a former employee of Anthony, testified:

"Q. Please, sir, do you recall the incident of Mr. Anthony talking with you—his attempt to purchase in fee this land from Mr. Barton? . . Q. Did he say anything to you with reference to the transaction? A. He told me he had tried to buy it, and Mr. Barton refused to sell it. Q. Then did he say anything else to you? A. All he said was he might change his mind, when he found out it was not good. Q. Was that before you slowed those wells down and put the cement in? A. Yes, sir. Q. How long before? A. Oh, probably two or three weeks before."

W. H. Green, also a former employee of Anthony, testified:

"Q. Did you ever have anything—any conversation with Mr. Anthony relative to his purchasing this—all the interest in the Barton lease? . . A. (By witness) That took place in my place of business in Moungs—filling station. Mr. Anthony came in one afternoon—I don't remember the exact time. He was excited. I said, 'What's the matter, Mr. Anthony?' . . A. (Witness) He said, 'I just had a rumpus with Mr. Barton'. I said, 'What's the matter between you and Mr. Barton?' He said, 'I tried to buy that lease, and the old son of a bitch refused to sell it to me.' Q. And then what additional thing was said? A. Well, let's see—wasn't anything but that, and I didn't ask no questions or anything. He said, 'I will make the old son of a bitch wish he had sold it before I am through with it'."

Defendants contend that this evidence was incompetent because neither an attempt to buy plaintiff's land nor statements in the nature of threats were pleaded by plaintiff.

The trial court ruled the evidence admissible to show Anthony's motive in acts and conduct alleged in plaintiff's petition. In this, the trial court did not err.

The purported attempt to purchase the land was not the basis of plaintiff's cause of action. The evidence was clearly admissible to show motive for Anthony's subsequent acts and conduct, forming the basis of plaintiff's cause. The statements were admissible in evidence as tending to prove the purpose of Anthony in closing the wells on plaintiff's land. Donaldson v. Josey, supra.

The ultimate issuable facts only, as distinguished from evidentiary facts and conclusions of law, must be pleaded. Probative facts requisite to prove ultimate facts need not, and ordinarily should not, be pleaded. 41 Am. Jur. 292. Under the general rule, it was unnecessary for plaintiff to plead the alleged attempt of Anthony to purchase plaintiff's land or his purported statements in order to prove them. Cragg v. Los Angeles Trust Co., 154 Cal. 633, 98 P. 1063; Manwaring v. Reynolds, 108 Kan. 777, 196 P. 1086.

Defendants contend the trial court erred in not rendering judgment for defendants because plaintiff failed to present her claim to the executors of the estate of S. W. Anthony within the time provided by law. The contention may be resolved by determining whether plaintiff's action is ex contractu or ex delicto.

Defendants urge that plaintiff's action is ex contractu, as an action for the breach of implied covenant in the oil and gas lease. Plaintiff asserts that the action is one ex delicto and that in such action, presentation of claim to the executors is not necessary. Plaintiff also contends that if her action is one ex contractu, defendants waived filing of claim with the executors by answering plaintiff's amended petition denying liability on grounds other than failure to present the claim to the executors.

It is well settled that where a claim arises in tort and the tort-feasor dies

before judgment, the claim need not be presented to the executor or administrator for allowance. United States F. & G. et al. v. Krow, 184 Okla. 444, 87 P. 2d 950; American Trust Co. v. Chitty, 36 Okla. 479, 129 P. 51; Donnell v. Dansby, 58 Okla. 165, 159 P. 317; Jones v. Woodward, 50 Okla. 704, 151 P. 586; Clover v. Neely, 116 Okla. 155, 243 P. 758.

The character of an action, as one in tort or one ex contractu, must be determined by the nature of the grievance rather than the form of the pleading. 1 Am. Jur. 442; Ft. Smith & W. R.R. Co. v. Ford, 34 Okla. 575, 126 P. 745.

"If the relation of the plaintiff and the defendant is such that a duty to take due care arises therefrom, irrespective of contract, and the defendant is negligent, then the action is one of tort. It is also well-settled law that one may sue in tort when there has been negligence in the performance or nonobservance of a contract, and not in contract, as the injury in such a case results, not from a breach of contract, but from negligence in the performance of it, for accompanying every contract is a common-law duty to perform the thing agreed to be done with care, skill, reasonable expediency, and faithfulness, and a negligent failure to observe any of these conditions is a tort as well as a breach of contract." 1 Am. Jur. p. 443 §51.

Much more will this be the case where the acts constituting the breach of the contract are willful, designed, intentional, purposeful, or malicious.

"Even the common law sometimes gave two or more remedies from which the plaintiff was entitled to elect which he would pursue. There are cases where, upon substantially the same facts, the law permits a recovery in the same action of damages either for the breach of an implied contract or for the wrongful act of the defendant, that is, either in contract or in tort. In such circumstances, the plaintiff may elect which remedy to pursue and maintain his action either in tort or on contract." 1 Am. Jur. p. 449 §57.

In L. B. Jackson v. Central Torpedo Co., 117 Okla. 245, 246 P. 426, 46 A.L.R. 338, this court stated the correct rule to be that:

"If the transaction complained of had its origin in a contract which placed the parties in such a relation that, in attempting to perform the promised service, the tort was committed, then the breach of the contract is not the gravamen of the suit. The contract in such case is a mere inducement creating the state of things which furnishes the occasion of the tort, and in all such cases the remedy is an action on the case."

The nature of plaintiff's grievance as disclosed by petition and the facts alleged, plainly and distinctly stated therein, show the action to be ex delicto and not ex contractu. Therefore, it was not necessary that plaintiff present her claim to the executors.

Defendants further contend that if plaintiff's cause of action is one ex delicto, it is barred by the statute of limitations in that the record shows that Anthony cemented and closed Barton Well No. 3 in April, 1940, and her action was not commenced until January, 1943, more than two years after Anthony's alleged wrongful act.

The trial court held that plaintiff had two years in which to file her action after it became obvious to her that it was the purpose of Anthony to plug and forever seal off the production from plaintiff's land. There was evidence tending to prove, and the trial court found, that defendant Anthony led plaintiff and her agent to believe that the cement was placed in Well No. 3 for the purpose of shutting off the water; that the cement was to be drilled out and the well placed back on production; that plaintiff relied upon defendant's statement and took no action until after the well was finally plugged, when it became obvious to plaintiff that there would be no further production. As this was well within two years before the action was commenced, the action was not barred.

Defendants contend that there could be no drainage from plaintiff's land to Anthony's land to the east for the reason that the evidence shows there was a fault line in the structure running between Barton No. 3 and Anthony No. 2. Defendants rely upon the testimony of their two expert witnesses, one a petroleum engineer and the other a geologist. These witnesses based their opinions on the fact that the Wilcox Sand was found at 1,540 feet below sea level in Barton No. 3 and the same sand was found in Anthony No. 2 at 1,551 feet below sea level, thus showing that the Wilcox Sand was 21 feet higher in Barton No. 3 than in Anthony No. 2. This, in the witnesses' opinion, indicated a fault or slip in the subsurface structure which sealed off the Wilcox Sand in the Barton lease from the same sand in the Anthony land. This difference in elevation of the sand in the two wells was shown, but it does not necessarily follow that a fault existed or that, if one existed, it was sufficient to effectively seal or shut off any connection in the sand between the two wells.

As was said in Hartman Ranch Co. v. Associated Oil Co. (Cal.) 73 P. 2d 1163, an exact knowledge of subsurface conditions, or an exact estimate of drainage, is in the nature of things impossible. The total thickness of the Wilcox Sand at neither well is shown, in the case at bar.

Barton No. 3 was drilled 20 feet into the sand and Anthony No. 2 was drilled 18 feet into the sand. For all the evidence shows, the sand may vary more or less than the 21 feet difference shown by elevation of the top of the sand in the two wells. Defendant's exhibit shows that the Sinclair-Prairie Well No. 12 on the Upton land, a direct offset to the Barton No. 3 to the south, was drilled 60 feet into the sand and that Tom Gilcrease No. 1, directly north of Barton No. 3, was drilled 28 feet into the sand. So, in sand of that thickness, a fault or slip in the subsurface formation of only 21 feet would not be sufficient to seal off or close connection of the sand between the two wells.

Moreover, there was evidence tending to show that when vacuum pumps were put on the Anthony wells they materially reduced the production of oil in well No. 1 on the Tom Gilcrease lease, offsetting Barton No. 3 to the north. That well on the Tom Gilcrease lease is shown to be west of the supposed fault line.

Furthermore, there is evidence tending to show that the well drilled by Upton 45 feet from the southeast corner of plaintiff's land, which well was also on the west side of the supposed fault line, continued to produce several years after Anthony cemented Barton No. 3 and so did well No. 1 on the Tom Gilcrease land. The Upton well was producing at the time of trial.

If there be a fault in the subsurface formation, as suggested by defendants' witnesses, Anthony No. 2 nevertheless could cause drainage from the Barton land. There was probable drainage from the Barton to the Tom Gilcrease well to the north and to the Upton well to the south, caused by Anthony closing the well on the Barton land.

The evidence shows difference in elevation of the top of Wilcox Sand throughout the field. For instance, there is a difference of 20 feet in the elevation of the top of the sand between Barton No. 1 and Sinclair-Prairie No. 10, direct offset to the south of Barton No. 1. There is as much reason for believing there is a fault between these two wells as there is for believing there is a fault between Barton No. 3 and Anthony No. 2.

There are many other assignments of error, going to matters of minor importance, which we deem unnecessary to discuss separately. Suffice to say that so far as actual damages are concerned, careful consideration of the entire record will disclose no substantial error. There is ample evidence reason-

ably tending to support the findings, judgment, and conclusions as to actual damage.

This brings us to the question of exemplary damages.

S. W. Anthony died after this action was commenced and before trial. Notwithstanding this, the court entered judgment against the executors for $5,000 punitive damages. Defendants contend that this was error in that punitive or exemplary damages may not be awarded against the personal representatives of a tort-feasor in such circumstances.

Plaintiff contends that defendants waived this alleged error in that it was not included in the first motion for new trial filed October 11, 1945, two days after the court filed the findings of fact and conclusions of law; and further asserts that the second motion for new trial, filed October 17, 1945, two days after the judgment was entered, in which the question was raised, is a nullity because it came too late in that it was not filed within three days after filing of the findings of fact and conclusions of law.

In the stipulation of the parties waiving a jury, it was provided that the findings of fact should be submitted to the respective counsel and filed at least five days before the judgment should be rendered. The effect of this stipulation was that the filing of the findings of fact and conclusions of law should not be considered as a final decision.

The first motion for new trial was apparently premature. Under the record made, the second motion for new trial was filed within time. The alleged error is therefore not waived.

The authorities seem to agree that where the defendant in a tort action dies after commencement of the action and before trial, his executors or administrators may not be held liable for exemplary damages. It was so held in Evans v. Gibson (Cal.) 31 P. 2d 389.

Therein it was said that the author of an annotation in 65 A.L.R. 1049 finds the rule well settled that punitive or vindictive damages cannot be awarded against the estate of a deceased tort-feasor. The annotator cites numerous decisions in support of the rule stated, among which are: Morris v. Duncan, 126 Ga. 467, 115 Am. St. Rep. 105, 54 S. E. 1045; Shiek v. Hobson, 64 Iowa, 146, 19 N. W. 875; Edwards v. Ricks, 30 La. Ann. 926; Johnson, v. Levy, 122 La. 118, 47 So. 422, 16 Ann. Cas. 978; Hewlett v. George, 68 Miss. 703, 13 L.R.A. 682, 9 So. 885; Rippey v. Miller, 33 N.C. 247; Wright v. Donnell, 34 Tex. 291; Sullivan v. Associated Billposters & Distributors (C.C.A. 2d) 42 A.L.R. 503, 6 F. 2d 1000; Meighan v. Birmingham Terminal Co., 165 Ala. 591, 51 So. 775. To these may be added Marcante v. Hein (Wyo.) 67 P. 2d 196.

The reason for the rule was stated in Hewlett v. George, supra, as follows:

"At common law this action would have abated upon the death of the defendant, and no recovery could have been had against her representative. The doctrine was that for a personal wrong the offender could not be followed into the grave, and the dead be visited with punishment. Our statutes have modified the common law to the extent of permitting a recovery against the representative of the deceased wrongdoer to an amount sufficient to compensate for the actual damages sustained by the injured party; but the realm of the dead is not invaded, and punishment visited upon the dead."

The decisions support the rule and there appear to be none to the contrary.

The court committed error in rendering judgment against the executors for punitive damages, but the judgment for actual damages and that for punitive damages are separable. The judgment of the trial court is modified and reduced insofar as it relates to punitive damages and otherwise affirmed.

HURST, C.J., DAVISON, V.C.J., and WELCH, CORN, and LUTTRELL, JJ., concur.