**Ali DJOWHARZADEH, Appellant,**

v.

**CITY NATIONAL BANK AND TRUST COMPANY OF NORMAN, a corporation, and Larry Shaver, an individual, Appellees.**

No. 54998.

Court of Appeals of Oklahoma, Division No. 2.

Jan. 19, 1982.

Rehearing Denied May 10, 1982.

Certiorari Denied June 16, 1982.

Released for Publication by Order of the Court of Appeals June 18, 1982.

Robert N. McIlroy, Norman, for appellant.

T. R. Benedum, Benedum & Benedum, Bill J. English, Norman, for appellee City Nat. Bank and Trust Co. of Norman.

John T. Edwards, Monnet, Hayes, Bullis, Thompson & Edwards, Oklahoma City, for appellee Larry Shaver.

BOYDSTON, Presiding Judge.

Bank Customer appeals summary judgment granted in favor of defendants Bank and Loan Officer. Customer alleged Loan Officer wrongfully disclosed confidential financial investment information to Bank president's wife and the wife of the chairman of the board of directors, who bought the investment property for their own account, causing Customer to lose a valuable real estate investment opportunity. Trial court ruled Bank owes no duty of confidentiality to Customer. We find it does and reverse.

## I

■ When summary judgment has been granted, the appellate court is required to examine the record and if there are either controverted material facts or, if the uncontroverted facts support legitimate inferences favoring the well pled theory of the party against whom the judgment is granted, the judgment will be reversed. *Weaver v. Pryor Jeffersonian*, Okl., 569 P.2d 967 (1977); *Northrip v. Montgomery Ward & Co.*, Okl., 529 P.2d 489 (1974); *Runyon v. Reid*, Okl., 510 P.2d 943 (1973), and Dist.Ct. Rule 13, 12 O.S.1973 Supp. Ch. 2 App.[1] It is this standard we apply to test the correctness of the judgment.

The central fact, that is the disclosure, is admitted by defendants. The depositions, affidavits and other evidentiary material amply support all other allegations. Plaintiff Customer alleges he learned about a bargain-priced duplex from a semi-retired realtor. The owner was asking $25,000 for property worth considerably more on the market, and was willing to take $5,000 as a down-payment and personally carry the balance.

Customer inspected the property on August 25, 1978, and decided to buy it. The duplex, near other property he owned, was not on the open market and the realtor informally agreed to "hold" it for a while to allow Customer time to borrow the $5,000 down-payment.

---

1. Substantial revisions to this rule are now in    effect. *See* 12 O.S.1982 Supp. Ch. 2 App.

The next day Customer applied to borrow the money for the down-payment at defendant Bank where he was a regular customer and had established good credit. As part of the loan application Customer made full disclosure about the proposed investment to Loan Officer, who immediately recognized the duplex was worth as much as $20,000 more than the asking price and agreed to consult the loan committee for approval of the loan. Next day he summarily turned down the loan on the ground Bank did not make "100% loans."

Within five days, Mary Louise Symcox and Linda Rogers bought the duplex. Respectively, they are the wives of Bank's president and senior vice-president (also chairman of the board of directors); both wives are bank stockholders and one is also an employee.

In her deposition, Ms. Symcox claimed she learned of the property from Loan Officer at a cocktail party. She insisted he did not tell her the exact location of the duplex and she "looked it up" at the courthouse. As it happened, she quickly discovered the name of the owner. In fact, the second person she called happened to be the owner of the property in question. He referred her to his realtor, the same man who was "holding" the property for Customer.

The two wives then bought the property, adding $500 to the purchase price to encourage the realtor to forget about his informal and nonbinding promise to give Customer time to borrow the down-payment. Ms. Symcox subtly reminded the realtor of his professional duty to submit her written offer to the owner.

In his deposition, Loan Officer testified vaguely he did not personally remember when or where he told Ms. Symcox about the property but conceded: "[I]f she says that I told her [Ms. Symcox] this information [at the cocktail party], then I told it to her." He denied telling the exact location of the duplex.

Customer testified Loan Officer first denied, then admitted the disclosure but characterized it as a "slip of the tongue," explaining:

Well, I'm sorry, my friend, but you know how the loan system works here? ... Well I have to tell her, that's the way it works, because of the position that she has in the board of directors.

He testified the bank has no policy concerning confidentiality regarding its customers' financial business and the subject has never even been discussed by management.

Customer offered other competent evidentiary material which substantiated his allegation that the duplex was priced well below market. In addition, Customer offered proof that: (1) the duplex was not publicly known to be for sale; (2) it was not officially listed with a realtor; (3) it was not advertised for sale either by newspaper or yard sign; (4) he intended to, and in fact did, actively pursue a loan at another institution; and (5) he did not give the bank permission to disclose the information. Suit followed a blunt refusal by Bank to discuss the merits of Customer's grievance.

Defendants pled several defenses, but the gist of their position is that a bank owes no confidential duty to its customers. Bank further argues that if a wrongful disclosure was made, it was outside the scope of the employee's duty and therefore Loan Officer is personally and solely liable for Customer's damages. Trial judge agreed, sustaining both defendants' motion for summary judgment; and accordingly, we address both defenses.

II

This is a case of first impression. Bank's principle argument is: because there is no prior supreme court decision or statute specifically declaring the existence of a confidential relationship between banks and their customers, then no such duty exists. Defendants also argue that no contract had been consummated and no fiduciary relationship existed, therefore, no legally recognized format exists within which to frame a valid cause of action.

Customer argues that such a conclusion is outrageous, unthinkable and contrary to

common sense and public understanding. We agree.

The relationship created when a prospective borrower applies for a loan from a bank is a very special one. It has not yet ripened into a contract—because it has not yet crossed the threshold of formal agreement. Neither is it fiducial—because it is by nature an arm's length transaction. It does, however, impose special duties on each party which go beyond mere matters of courtesy.

Customer has the duty to fairly and fully disclose his assets, personal credit history and circumstances, intimate intra-family situations, past conduct, future plans and a myriad of other sometimes highly personal information.[2] Details concerning the purpose of the loan—for reasons amply demonstrated by the facts of this case—are no less private to the applicant. In fact, most of the information which is routinely demanded by and candidly disclosed to a bank by its customer is so critically personal that it would not even be shared with the customer's own minister.

This intimate, private information is not furnished to any bank official lightly, nor, strictly speaking, voluntarily. Rather, the borrower is compelled to disclose the information. The delicately balanced relationship thus temporarily created is not, in ordinary cases, one composed of equals because of the inordinate power of the bank. The precarious position of the borrower and the relatively superior position of the bank mandates there be a counterbalancing special duty imposed on the part of the bank.

Banks exist and operate almost solely by using public funds and are invested with enormous public trust. Their financial power within the community amounts to a virtual financial monoploy in the field of money lending. The legislature has carefully defined their corporate charge within finite limits in direct proportion to their power.

One goal of this system is to assure that banks do not compete financially with their customers, but rather serve public financial needs fairly and evenly. Implicit in this policy of fair dealing and evenhandedness is a requirement that banks not use their favored position to the detriment of their customers, either directly or indirectly.

If it were otherwise, banks would quickly become pervasive financial webs, serving only their owners, managers and friends by trapping all the best investments being innocently funnelled by the public through their loan departments. Such a policy would soon destroy their public usefulness and benefit neither the public nor, ultimately, the banking industry.

Other jurisdictions have taken similar positions. In *Peterson v. Idaho First Nat'l Bank*, 83 Idaho 578, 367 P.2d 284 (1961), the Idaho Supreme Court held banks have an implied duty to keep their customer's financial status confidential and not disclose it to third persons absent customer authority. Though the specific issues are not squarely in point, the case demonstrates a pertinent underlying policy, citing with approval the following language now found at 10 Am. Jur.2d Banks § 332 (1963):

[I]t is an implied term of the contract between a banker and his customer that the banker will not divulge to third persons, without the consent of the customer, express or implied, either the state of the customer's account or any of his transactions with the bank, or any information relating to the customer acquired through the keeping of his account, unless the banker is compelled to do so by order of a court ....

The court went further:

It is inconceivable that a bank would at any time consider itself at liberty to disclose the intimate details of its depositors' accounts. Inviolate secrecy is one of the inherent and fundamental precepts of the relationship of the bank and its customers or depositors....

■ We hold, under these circumstances, Bank's relationship to a loan applicant im-

---

**2.** Customer may, in fact, be imprisoned for falsifying a credit application. *See* 18 U.S.C.A. § 1014 (1976), and 21 O.S.1971 § 1501.

plicitly imposes the duty to keep the contents of loan applications confidential. This duty has existed traditionally and continues to exist, if not specifically in the law books, at least in the mind of the public in general and within the banking community in particular.

We take particular notice of banking practices and tradition which cultivates, encourages and even advertises the fact that banks can and should be trusted. Indeed, the words "trust," "security" and "guaranty" are part of the name of many banks, including defendant Bank. The fact that no prior Oklahoma cases or statutes specifically define such a relationship is more of a tribute to past faithful performance of bankers than a proof that a special duty does not exist or need only be optionally observed.

We conclude Customer has alleged a valid cause of action which is amply supported by competent admissions and evidence. It remains only for the jury to decide the proper inferences to be drawn from these remarkable facts.

### III

We next turn to whether Bank can properly be excused on the ground Loan Officer's disclosure was outside the scope of his employment.

█ The record clearly shows confidential information was given to Loan Officer whose specific duty was to collect and keep such information. Damages caused by his carelessness in its handling are directly chargeable to the bank. *Ocean Accident & Guarantee Corp. v. Denner,* 207 Okl. 416, 250 P.2d 217 (1952).

Customer's cause of action is, with these special facts, properly framed in terms of tortious conduct. It could have as properly

been pled in terms *ex contractu.*[3] He alleges that Bank has a duty of confidentiality which it breached, causing him financial damage. Indeed it appears that Bank's stockholders, officers and directors benefited directly and indirectly from the transaction. He has offered proof that his damages resulted from deliberate conduct because Bank not only breached its duty, but it has no official policy recognizing this basic customer safeguard, and may, in fact, have a contrary policy requiring employees to inform insiders of prime investment opportunities. These facts, if proven, are sufficient to raise jury issues both as to actual and punitive damages.

Summary judgment is reversed and the cause reinstated for further proceedings consistent with this decision. All costs taxed against defendants.

BACON and BRIGHTMIRE, JJ., concur.

---

**3.** *Oklahoma Natural Gas Co. v. Pack,* 186 Okl. 330, 97 P.2d 768 (1939), stands for the proposition that every contract carries with it the common law duty to perform with care, skill, reasonable expediency and faithfulness which, if breached, may be treated as a tort as well as a breach, giving the injured party the option to elect which legal course to pursue. This allows recovery in situations where a breach of contract results from willful, intentional, purposeful or malicious conduct, thus expanding the statutory right to recover punitive damages ordinarily excluded by 23 O.S.1971 § 9 in contract actions. *See Leigh v. Wadsworth,* Okl., 361 P.2d 849 (1961); *Morris v. Barton,* 200 Okl. 4, 190 P.2d 451 (1947); *Owens v. State,* 133 Okl. 183, 271 P. 938 (1928); *Lilly v. St. Louis & S. F. Ry. Co.,* 31 Okl. 521, 122 P. 502 (1912); and *Hobbs v. Smith,* 27 Okl. 830, 115 P. 347 (1911).