**Lynn J. JORDAN, an individual, d/b/a Jordan & Young Farms, Plaintiff–Appellant,**

v.

**SHATTUCK NATIONAL BANK, a national banking association; and Ned Stuart, an individual, Defendants–Appellees.**

No. 85–2901.

United States Court of Appeals, Tenth Circuit.

Feb. 17, 1989.

George Nelson and Chris D. Caldwell of Nelson & Caldwell, Oklahoma City, Okl., for plaintiff-appellant.

Donald R. Wilson and Sherry L. Smith of Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Okl., for defendants-appellees.

Before McKAY, LOGAN and ANDERSON, Circuit Judges.

LOGAN, Circuit Judge.

In this diversity action for tortious breach of a confidential relationship and interference with contract, plaintiff Lynn Jordan appeals from a directed verdict in favor of defendants Ned Stuart and Shattuck National Bank. On appeal, Jordan contends that the directed verdict was improper because a reasonable jury could have found in his favor on both the issues of liability and damages. We agree, and accordingly reverse and remand for a new trial.[1]

In reviewing the grant of a motion for directed verdict, this court must view the evidence and all reasonable inferences to be drawn from it in the light most favor-able to the party opposing the motion. *Richardson v. City of Albuquerque,* 857 F.2d 727, 731 (10th Cir.1988); *Gruntmeir v. Mayrath Indus., Inc.,* 841 F.2d 1037, 1040 (10th Cir.1988). A directed verdict is improper unless "all the inferences to be drawn from the evidence are so in favor of the moving party that reasonable persons could not differ in their conclusions." *Federal Deposit Ins. Corp. v. Palermo,* 815 F.2d 1329, 1335 (10th Cir.1987). The essential inquiry, then, is "whether the evidence is sufficient to create an issue for the jury." *J.I. Case Credit Corp. v. Crites,* 851 F.2d 309, 311 (10th Cir.1988).

Viewed in the light most favorable to Jordan, the testimony adduced at trial reveals the following. Jordan is a farmer and cattle rancher in northern Texas. For some time before 1984, he worked for Eddie Wiley, a rancher who leased approximately eleven sections of contiguous grassland in northern Texas known as the Lazy S Ranch. The Lazy S was owned by Wiley's two brothers-in-law, Jerry and Mark Schultz, and Wiley's wife, Jan Schultz Wiley. Jerry and Jan each owned three and one-half sections while Mark owned four. Wiley's leases were oral and apparently automatically renewed annually according to a mutual understanding.

In early 1984, Jordan proposed to Wiley that Jordan sublease the Lazy S, which he would use along with leases acquired on other properties to operate his own farming and ranching business. Wiley agreed to the sublease, apparently because he had had good experience with Jordan and desired to focus on other business opportunities. In April 1984, Wiley and Jordan & Young Farms (JYF), a partnership formed by Jordan and an associate to conduct cattle and farming operations, entered into a written sublease covering the ranch. The term was five years with an option to renew for an additional five years. The sublease also called for annual payments, half

---

1. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed.R. App.P. 34(a); 10th Cir.R. 34.1.9. The cause is therefore ordered submitted without oral argument.

to be paid by May 1, and half to be paid by November 1.

In May 1984, Jordan approached defendant Stuart, chairman and president of defendant Shattuck National Bank (the Bank), located in Oklahoma, and asked for a $150,000 loan to finance the cattle and other farming operations of JYF. After Jordan revealed that part of JYF's operations would consist of grazing customers' cattle on the Lazy S Ranch, Stuart responded to the effect that he had heard Wiley's primary leases with the Schultzes were not going to be renewed. Jordan answered that he knew nothing about the matter, but would provide Stuart with more information concerning Wiley's leases when the latter returned to town two days later. Jordan then provided Stuart with a copy of the written sublease between Wiley and JYF and some pro forma operating projections of JYF. Stuart indicated he would take the loan application before the loan committee.

Later that day, Stuart called Vernon Schultz, the uncle of the Lazy S Ranch owners, who was Stuart's friend and co-director on the board of a different bank. Sometime within the prior year, unknown to Wiley, Jerry Schultz had talked with Vernon about the possibility of Vernon taking over the lease on Jerry's portion of the Lazy S. Jerry Schultz and Wiley had had some disputes over late rent payments and other business dealings and acrimonious feelings had developed between them. Additionally, Stuart himself apparently had ill feelings towards Wiley stemming from previous business associations. At a bank board meeting, Vernon Schultz had mentioned to Stuart the possibility of obtaining a loan were he to negotiate a lease from Jerry.

In his telephone conversation with Vernon Schultz, Stuart revealed that someone was attempting to sublease the Lazy S Ranch and asked if Vernon was still being offered the lease. Vernon then called Jerry Schultz about the matter, who in turn called Stuart. Jerry then contacted his brother Mark and also Jordan, apparently upset during both conversations by the fact that Wiley was going to receive more money on the sublease than he was paying on the primary lease. Apparently, Jerry was familiar with the terms of the sublease before these conversations.[2]

Two days after his initial meeting, Jordan again went to see Stuart. Jordan offered Stuart two $50,000 certificates of deposit to secure the loan. Stuart indicated that the Bank did not like to take certificates of deposit as collateral, and he informed Jordan that his loan application had been denied. According to Jordan's testimony, Stuart remarked that he did not want anything to do with Wiley.

Over the next two months, Jerry Schultz went to see Wiley on two different occasions. After arguing about the lease price differential, the terms of a different mutual business arrangement, and Wiley's authority to use the land, Jerry informed Wiley that he was terminating the primary lease on his three and one-half sections of the Lazy S. Subsequently, Jerry leased this land to his uncle Vernon. Wiley and Jordan kept their leases and subleases, respectively, on the remaining portion of the ranch.

Jordan then brought this action against Stuart and the Bank, alleging that Stuart had wrongfully disclosed confidential information regarding the sublease and intentionally interfered with his right of contract. Jordan also sought punitive damages. At the close of Jordan's case-in-chief, the district court directed a verdict in the defendants' favor, on the grounds that no reasonable jury could find (1) that Stuart owed or breached a duty to Jordan not to disclose this type of information; (2) that Stuart interfered with a contract between Jordan and Wiley; or (3) that Jordan sustained damages.

---

**2.** Jerry Schultz testified that he may have learned the terms of the sublease from Stuart, Wiley, or Jordan. II R. 120. Viewing all the testimony in Jordan's favor, however, especially that of Mark Schultz and Wiley, a reasonable inference is that Jerry Schultz learned the terms directly from Stuart or indirectly from Stuart through Vernon Schultz.

## I

Defendants first contend that, because Stuart's inquiries were part of a necessary investigation into collateral, they breached no duty to keep information derived from loan applications confidential. The parties do not dispute that Oklahoma law applies to this case. The only relevant Oklahoma case brought to our attention is *Djowharzedeh v. City Nat'l Bank & Trust Co.*, 646 P.2d 616 (Okla.Ct.App.1982). There, the Oklahoma Court of Appeals recognized a duty on the part of a bank and a loan officer to keep loan application materials confidential, and held that a cause of action could lie for a breach of that duty.

At trial, however, the district judge questioned the authoritativeness of a state intermediate court of appeals decision when the state supreme court has not spoken on the issue. But it is clear that "[i]n the absence of a state supreme court ruling, a federal court must follow an intermediate state court decision unless other authority convinces the federal court that the state supreme court would decide otherwise." *Delano v. Kitch*, 663 F.2d 990, 996 (10th Cir.1981) (citing *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982); *Hicks ex rel. Feiock v. Feiock,* —— U.S. ——, 108 S.Ct. 1423, 1428 & n. 3, 99 L.Ed.2d 721 (1988). Defendants cite no authority that convinces us the Oklahoma Supreme Court would not follow *Djowharzedeh.* Indeed, a Justice of that court recently cited *Djowharzedeh* with apparent approval. *See Alva State Bank & Trust Co. v. Dayton*, 755 P.2d 635, 639 n. 18 (Okla.1988) (Kauger, J., concurring).

In *Djowharzedeh*, a bank customer learned of a bargain-priced duplex for sale. The customer decided to buy the duplex and applied to his bank for a loan. As part of the loan application process, the customer made full disclosure about the deal to a bank loan officer. The next day the bank turned down the loan, and five days later the wives of the bank's chairman and president bought the property. The customer sued, adducing evidence during discovery that the loan officer told one of the wives about the duplex at a cocktail party. The trial court granted summary judgment in favor of the loan officer and bank.

The court of appeals reversed. Noting that this was a case of first impression in Oklahoma, the court rejected the defendants' position that the bank and its officer did not owe a duty of confidentiality to the customer. The court reasoned that the highly detailed and personal information requested by banks in loan applications is not given voluntarily, but rather is compelled as a prerequisite to receiving a loan. Further, the court noted that banks are the repository of enormous public trust, depend solely on the public's funds to operate, and have a virtual monopoly on money lending. Thus, the court concluded that banks must not use their position to compete financially with customers or otherwise act to their detriment. The court also held that the bank was liable for the conduct of its loan officer. *Id.* at 619–20.

In the present case, Jordan claims that the Bank and its employee wrongfully disclosed confidential loan application material to his detriment. This allegation is sufficient to state a cause of action under *Djowharzedeh.* At trial, defendants repeatedly emphasized the notion that they received no pecuniary benefits from Stuart's disclosure, apparently attempting to distinguish this situation from *Djowharzedeh*, a case they do not discuss in their brief. Concededly, the element of personal gain is not as palpable in the present situation as in *Djowharzedeh.* The *Djowharzedeh* court, however, did not state that pecuniary or other benefit was essential to a cause of action. The court merely noted that the bank's stockholders, officers, and directors had received direct and indirect benefits from the disputed transaction. *Id.* at 620. But even assuming that personal benefit is an essential element, a reasonable jury could conclude that Stuart and the Bank benefitted by informing Vernon and Jerry Schultz of Jordan's deal with Wiley.

In a different context, the United States Supreme Court has noted that "whether an

insider personally benefits from a particular disclosure" is a question of fact. *Dirks v. SEC*, 463 U.S. 646, 664, 103 S.Ct. 3255, 3266, 77 L.Ed.2d 911 (1983). A personal benefit can be indirect, such as enhancement of reputation, which translates into future gain. *Id.* at 663, 103 S.Ct. at 3266. Moreover, "[t]he elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend." *Id.* at 664, 103 S.Ct. at 3266. At trial, Stuart testified that he called Vernon Schultz in his capacity as an officer of the bank and as an individual. Without deciding whether personal benefit is essential to a *Djowharzedeh* cause of action under Oklahoma law, should the district court deem it appropriate to so instruct the jury, Jordan will be entitled to that body's determination whether Stuart or the Bank derived a benefit from the disclosure.

Defendants' main argument, however, is that because the sublease was offered as collateral for the loan, Stuart had a fiduciary duty to investigate its validity. But the question whether the sublease was to serve as collateral also was for the jury. There was evidence favoring Jordan's position that the sublease was not intended as collateral. After Stuart testified that the Bank normally did not take leases as loan collateral, he was asked why this was not relayed to Jordan. The following colloquy ensued:

"A: I have no idea. I just didn't—I wasn't interested in the leases as collateral, and I don't think we discussed it other than the fact that he presented those to me.

Q: Okay. So you were not interested in the leases as collateral?

A: Not as collateral. No, sir."

II R. 34. Defendants argue that these statements merely refer to the undesirability of leases as collateral, and not to whether the sublease was intended to serve as collateral. However, this is the classic type of determination to be made by the factfinder.

Defendants also contend that the information Stuart disclosed was not confidential and, even if it was, Jordan impliedly consented to its disclosure. As we read *Djowharzedeh*, all contents of loan applications are confidential, 646 P.2d at 619–20, except perhaps to the extent they relate facts generally known to the public, which these were not. Moreover, as to implied consent, whether the sublease was intended as loan collateral is at least uncertain. In any case, we do not imply that a bank automatically receives implied consent to investigate collateral in any manner it wishes.

Certainly the Bank is legitimately concerned with the status of a lease when considering loaning money for operations that depend on the viability of that lease. Under Oklahoma law, however, the dictates of confidentiality require that information be acquired in a manner consistent with the protection of a loan customer's privacy interests. In the instant case, for example, the Bank could simply have made the loan contingent upon Jordan presenting a written primary lease between Wiley and the Schultzes covering the term of his sublease. Or, if the Bank had sufficient misgivings, it simply could have denied the loan altogether without further investigation. We hold that the district court erred in taking the misuse of confidential information issue from the jury.

II

The district court also directed a verdict for the defendants on Jordan's claim of malicious interference with his contract with Wiley. Under Oklahoma law, Jordan was required to present evidence that Stuart maliciously interfered with his sublease. *See Motive Parts Warehouse v. Facet Enters.*, 774 F.2d 380, 390 (10th Cir. 1985); *Mac Adjustment, Inc. v. Property Loss Research Bureau*, 595 P.2d 427, 428 (Okla.1979). Oklahoma defines malice as "the intentional performance of a wrongful act without justification or excuse." *Motive Parts*, 774 F.2d at 390 (citing *Bennett v. City Nat'l Bank & Trust Co.*, 549 P.2d 393, 397 (Okla.Ct.App.1975)).

Upon a careful review of the record, we believe a reasonable jury could conclude that Stuart's disclosure to Vernon or Jerry Schultz was principally motivated by his personal dislike for Ed Wiley and his desire to see the primary leases go instead to his friend Vernon Schultz. For instance, Jordan testified that as he was leaving Stuart's office after their second loan meeting, Stuart stated that he wanted nothing to do with Wiley. III R. 147. Vernon Schultz testified that Stuart later laughed about the proposed sublease, indicating it was "as fake as a three dollar bill," arguably illustrating an impression held by Stuart that Wiley was simply using the sublease with Jordan as a ruse to indirectly borrow money from the Bank. II R. 102. Stuart himself testified that he did not like doing business with Wiley and did not want to talk to him directly about the terms of the primary lease. II R. 51, 65.

Although the law does not impose an obligation on people to do business with those they do not like, it does require abstention from unwarranted interference with the right of others to do business with the disfavored party. In this case, although Stuart did not interfere directly with Jordan's sublease with Wiley, he could not fail to know that a cancellation of the primary lease would have an indirect adverse effect on the sublease. It was for the jury to decide whether Stuart's disclosure was "without justification or excuse."

### III

Defendants next contend that even if Stuart's actions were tortious, Jordan suffered no damages as a result. This view also was held by the district court which concluded, apparently because of a falling cattle market during the period in question, that "the plaintiff probably sustained fewer damages by failure to get this land than if he had gotten it." III R. 226.

Under Oklahoma law, the difficulty of calculating damages should not bar an award if there is sufficient proof, accepted by the jury, that the plaintiff suffered financial losses because of the defendant's tortious conduct. *Fielder v. McKea Corp.,*

605 F.2d 542, 547 (10th Cir.1979); *see also George v. Greer,* 207 Okla. 494, 250 P.2d 858, 860 (1952). Jordan adduced sufficient proof of damages to warrant submission of this issue to the jury. He offered reasonable proof of what he earned in 1984 from the cancelled portion of the subleased land and of what he could have made in 1985. The average of these figures was then extrapolated over the next three years to arrive at a total profit/damage figure.

Defendants argue, based on a review of Jordan's 1984 tax return, that he actually incurred a loss that year and that the interest expense alone on a $150,000 loan, which Jordan did not figure into his calculations, would have pushed his operating income into the red. Defendants' first argument fails to recognize that Jordan's tax return covered his entire farming and ranching operations, and that income from cattle operations on the subleased land might have been masked by greater losses from Jordan's other activities. In addition, Jordan adduced evidence showing that the interest on loan proceeds which would have been used on the disputed portion of land was not sufficient to cause a loss attributable to that parcel. We do not pass on the accuracy of Jordan's calculations. We simply hold that there was sufficient proof of loss for the jury to assess the reasonableness of those figures and make an award of damages.

Finally, defendants argue that even if damages exist, they are not causally related to Stuart's disclosure. Alternatively, they argue that Jordan failed to mitigate his damages by leasing the land directly from Jerry Schultz. As concerns proximate cause, the connection between Stuart's disclosure and the arguments between Wiley and Jerry Schultz, which resulted in the lease cancellation, is not so attenuated that no reasonable jury could find causation. Nor can we say, on mitigation, that Jordan acted unreasonably in declining to bypass Wiley and lease directly from Jerry Schultz. Wiley claimed to have a right to lease Jerry's acreage; he also had been Jordan's long-time employer and associate and had helped arrange the busi-

ness venture. Also, it is not clear that Jerry Schultz ultimately would have agreed to a direct lease to Jordan. These are issues for the jury.

REVERSED and REMANDED.