**OAKLEY BUILDING & LOAN CO., Plaintiff-Appellant, v. MURPHY, et, Defendants-Appellees.**

Ohio Appeals, First District, Hamilton County.

No. 7025.   Decided December 6, 1948.

James G. Headley, Rendigs & Fry, Cincinnati, for Oakley Building & Loan Co., plaintiff-appellant.

Walter Schmitt, Cincinnati, for Daniel F. Murphy, defendant-appellee.

Rendigs & Fry, Cincinnati, for Indemnity Insurance Company of North America, defendant-appellee.

**OPINION**

By MATTHEWS, PJ.:

This is an appeal on questions of law from a judgment rendered in an action for a declaratory judgment. The plaintiff is a corporation organized under the laws of Ohio relating to building and loan associations, and as such authorized to receive money on deposit. The defendant, the Indemnity Insurance Company of North America is a corporation qualified to do business in Ohio.

The case comes before this Court on a record containing both a separate finding of facts and conclusions of law, and also a bill of exceptions containing all the evidence.

The defendant, Daniel F. Murphy, deposited $100.00 with the plaintiff on December 29th, 1936, and was issued a book in which to record his deposits and withdrawals. During 1937 he made 25 deposits and withdrew nothing, so that at the close of 1937 he had a balance of $3000.00 to his credit. He made no further deposits, but by allowing the dividends to accumulate there became due to him on December 18th, 1947 a balance of $3200.32.

In addition to making these deposits which were credited in his book and upon which dividends were credited, Murphy had other transactions with the plaintiff's cashier consisting of the cashier giving a receipted deposit slip for money which Murphy left for safe keeping. The controversy between the parties arises out of one such transaction. The circumstances of this transaction are as follows:

On December 21st, 1941 Murphy went to the plaintiff's place of business and delivered two envelopes, each containing $1000.00, through the receiving teller's window to the cashier, with whom he had similar transactions and the cashier gave him a deposit slip showing $2000.00 had been deposited in his account with the plaintiff. The account was identified by its number, the cashier wrote on it "Dup." and signed his name thereunder and signed Murphy's name at the bottom under the printed words "Depositor's Name." On one of the en-

velopes, Murphy had written his name and under his name was written "To be called for", and while he would not identify those words as being in his handwriting, it was conceded by his counsel that it was his handwriting. After the envelope was delivered to the cashier he endorsed thereon "A receipt given" and thereunder placed his initials.

There is evidence that there was a limitation at the time upon the amount of deposit the plaintiff could take from a single depositor, and that this money was left for safe keeping against the time when it could be accepted on an interest or dividend drawing basis. There is also evidence from which the inference can be drawn that the only purpose was to leave it for safe keeping, and returned to Murphy upon his demand. There is no evidence that the $2000.00 was received for immediate credit in the pass book. Murphy always considered it a different kind of deposit, and when he received a card from the plaintiff stating the balance due him, which made no reference to the transaction, he signed the card and returned it to plaintiff. The trial court did not choose between these conflicting inferences, concluding as a matter of law that in either event the cashier was acting for and on behalf of the plaintiff at the time.

About six months after this transaction, it was discovered that the cashier had embezzled some of the plaintiff's funds and had concealed the fact for awhile by using $1000.00 of this money to satisfy the demands of depositors. In other words, he had taken $1000.00 of this money and paid it to the plaintiff, leaving $1000.00 in the envelope in his personal box in the plaintiff's vault at the time of the exposure. The trial court found as a matter of law that as the plaintiff had received the benefit of this $1000.00, it would be inequitable for it to retain it.

During the trial, the $1000.00 which remained in the envelope was paid to the Clerk of Courts to abide the order of the court.

On these findings, the Court entered judgment against the plaintiff for $2000.00, with interest on $1000.00 at 6% per annum from July 18th, 1942. A few days after the judgment was rendered, the Court ordered the Clerk of Courts to pay to Murphy the $1000.00 which had been paid to him to abide the action of the Court.

It should be noted that Murphy did not pray specifically for a money judgment. His answer did end with a general prayer for such relief as might be found to be proper, and as appellant has not assigned the point as error or noticed it in brief or oral argument, we consider the point to have been waived.

As already noted, the trial court. found two principles of law, both of which when applied to the facts found, imposed a liability upon the plaintiff to reimburse the defendant. Murphy for the $1000.00 used by its cashier to replace the money embezzled by him.— (1) Unjust enrichment by the plaintiff at Murphy's expense, and (2) The duty of a principal to answer for the acts of its agent in the course of his employment. While we have concluded that the second principle is sufficient, we shall briefly discuss the first to indicate our reasons for placing our affirmance on the second.

(1) It will be observed that the purpose of the cashier in using Murphy's money was to satisfy his (the cashier's) hidden obligation to the plaintiff and that the net result of the double embezzlement was to place the plaintiff in the same position it would have occupied had there been no embezzlement at all. The question is, whether under such circumstances it is inequitable to permit the status quo to stand. Would it result in the unjust enrichment of plaintiff?

On this subject we find section 142, Restatement of Law,. Restitution, in which it is stated that:

"(1) The right of a person to restitution from another because of a benefit received is terminated or diminished if, after the receipt of the benefit, circumstances have so changed that it would be inequitable to require the other to make full restitution.

"(2) Change of circumstances may be a defense or a partial defense if the conduct of the recipient was not tortious and he was no more at fault for his receipt, retention or dealing with the subject matter than was the claimant.

"(3) Change of circumstances is not a defense if

"(a) the conduct of the recipient in obtaining, retaining or dealing with the subject matter was tortious, or

"(b) the change occurred after the recipient had knowledge of the facts entitling the other to restitution and had an opportunity to make restitution."

And in the "Comment" on this section at page 570, it is said:

"Likewise, although the money so obtained has been used for the payment of the principal's debts, if thereby the agent is enabled to steal other money from the principal, the fact that the principal has received no net benefit from the payment would prevent the existence of a duty of restitution."

And under "Illustration" at page 573 this example is stated:

"A, without authority, but having power to bind B thereby, borrows $1000 from C purporting to be acting for B. A retains this for his own purposes. To prevent discovery, he borrows $1000 from D, purporting to act for B, but this time without power to bind him. With this he pays C and averts discovery, in the meantime embezzling larger sums from B. B is under no duty of restitution to D."

Referring to the general rule, permitting a right of recovery from a principal who, with knowledge of the facts has received money through the unauthorized act of his agent on the theory that the retention of the money is a ratification of the agent's act, it is stated in 2 Am. Jur., 183:

"But the principal cannot be said to have received the benefit of an unauthorized loan where the sum borrowed does not increase his money in hand or the amount he is entitled to receive from his agent, or where the money is not used to extinguish outstanding liabilities against him, and, accordingly, the general rule is held not to apply where the agent, being in default to his principal, borrows money in the principal's name and uses it to make good his defalcation."

The opposite conclusion was reached in Duffy v. Scott, 129 A. L. R. 487 (—— Wis. ——, 292 N. W. 273). The cases on this subject are collected in an annotation to this case from which it appears that the weight of authority is against the right of recovery.

We have been referred to no Ohio case on this subject. In view of that fact, our inclination would be to hold in accord with the Restatement and the weight of authority that such circumstances do not show an unjust enrichment, therefore, no cause of action arises.

(2) However, if the act of receiving this money for safekeeping was within the apparent authority of the cashier, recourse to the principle of unjust enrichment was not necessary to impose a liability. We think the trial court was justified in so finding.

By §9648 GC, building and loan associations are expressly authorized to receive money on deposit. This section was applied in **Vance v. Warner, 129 Oh St, 357,** in which the Court held that the stockholders of a building and loan association were subject to a double liability upon their stock under

**Section 3 of Article XIII of the Constitution of Ohio,** as it then existed, just as stockholders in corporations organized under the banking laws were liable.

We have found no case dealing with the liability of building and loan associations for special deposits, but have found cases dealing with the liability of banks for such deposits. Whether the money was accepted for future credit drawing interest or dividend, or it was accepted for safe-keeping, and to be returned in specie on demand, we are of the opinion that the act of the cashier was within the scope of his apparent authority and, therefore, was binding upon the plaintiff, whose agent he was.

In 7 Am. Jur., 195, it is said: "It is also settled that the receipt of special deposits for safe-keeping is within the power of national banks, and the power of the cashier to receive them and to bind the bank may be inferred from the usage and custom of the bank."

In Pattison v. Syracuse National Bank, 80 N. Y., 82, the Court analyzed the cases on this subject as to both state and national banks. The Court held as stated in the syllabus that:

"The power to receive special deposits is incidental to the business of banking.

"The term 'special deposits' includes money, securities, and other valuables delivered to banks, to be specifically kept and re-delivered; it is not confined to securities held by the banks as collateral to loans."

At pages 94 and 95, the Court said:

"A reference to the history of banking discloses that the chief, and in some cases the only, deposits received by the early banks, were special deposits of money, bullion, plate, etc., for safe-keeping, to be specifically returned to the depositor; that such was the character of the business done by the Bank of Venice (the earliest bank) and the old Bank of Amsterdam, and that the same business was done by the Goldsmiths of London and the Bank of England, and we know of none of the earlier banks where it was not done. The definition of the business of banks of deposit, in the encyclopaedias, embraces the receiving of the money or valuables of others, to keep until called for by the depositors. (1 Encyclopaedia Americana; Bank 543; 1 English Encyclopaedia of Arts and Sciences, 833, 837, 841.) And although, in modern times, the

business of receiving general deposits has constituted the principal business of the banks, it cannot be said that the receiving of special deposits is so foreign to the banking business, that corporations authorized to carry on that business are incapable of binding themselves by the receipt of such deposits."

In American National Bank v. Adams & Co., L. R. A.; 1915 B, 542 at 545, it is said: "The rule that a bank is bound by the acts of its cashier in accepting deposits which come within the scope and meaning of the term 'special deposits' has become so well settled as to admit of but little question."

In the syllabus to **Busher v. Fulton, Supt. of Banks, 128 Oh St., 485,** it is stated that: "A 'special deposit' is a deposit for safe-keeping, to be returned intact upon demand. The relationship of bailor and bailee is created between the depositor and the bank."

See, also: 9 C. J. S., 562.

By §9648 GC, building and loan associations are authorized to receive money on deposit without any qualification as to the kind of deposit or the terms of the deposit other than that no more than the legal rate of interest should be paid.

We, of course, are not holding that an Ohio building and loan association has all the characteristics and is governed by all the banking laws of the state. We do hold, however, that where a building association places its business of accepting deposits in charge of an agent held out by it to the public as its cashier, and such officer or agent accepts a deposit either for the purpose of creating the relation of debtor and creditor or of bailor and bailee, such building association becomes bound to the depositor according to the terms agreed upon by its cashier. This is in accordance with the long-established rule that the cashier is the chief executive officer of a bank. 7 Am. Jur., 187.

For these reasons, the judgment is affirmed.

MATTHEWS, PJ, ROSS & HILDEBRANT, JJ, concur in syllabus, opinion & judgment.