GROOB et al., Appellants,

v.

KEYBANK and KeyCorporation, Appellees; Sapinsley, Defendant.

[Cite as *Groob v. KeyBank,* 155 Ohio App.3d 510, 2003-Ohio-6915.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–020191.

Decided Dec. 19, 2003.

512

Waite, Schneider, Bayless & Chesley Co., L.P.A., Stanley M. Chesley, Paul M. DeMarco, Robert F. Croskery, and Melinda E. Knisley, for appellants.

Green & Green, Lawyers, Jane M. Lynch, and Erin B. Moore, for appellees.

MARK P. PAINTER, Judge.

{¶ 1} This case present two questions of law that have received little judicial attention in Ohio. The first is whether a bank owes a duty to prospective loan applicants to keep their business information confidential. The second is whether a principal is liable for the intentional torts of its agent when the agent's position aided the agent in committing the tort. We answer yes to both questions.

{¶ 2} Plaintiffs-appellants Jeffrey Groob, Kathryn Groob, and Lowell Bowie contest the trial court's directed verdict on the issues of fiduciary duty and negligence on the part of defendants-appellees KeyBank and KeyCorporation (collectively, "Key"). The Groobs and Bowie also claim that the trial court erroneously instructed the jury on the issue of respondeat superior and negligently failed to instruct the jury on the issue of ratification. They further argue that the trial court erred in excluding the testimony of one of their expert witnesses. We affirm in part, reverse in part, and remand the case for further proceedings.

## I. The Goose that Laid the Golden Egg

{¶ 3} In April 1997, John Scheve was selling his business, Oldfield Equipment Company. Oldfield rented and repaired hydraulic pumps. Jeffrey Groob was interested in purchasing Oldfield. Groob owned and operated Groob Consulting, Inc., with his wife, Kathryn. Groob signed a nondisclosure agreement with Scheve and performed extensive research on the company and the market to determine whether it was a worthwhile investment. He sought financing for the proposed purchase from two banks. Both rejected his proposals.

{¶ 4} Groob decided to involve Lowell Bowie in the Oldfield investment because Groob did not have sufficient individual finances to successfully complete the purchase. While it is unclear from the record what role Bowie was to play, Groob saw him either as a partner or as a business advisor.

{¶ 5} The pair then decided to pursue financing from KeyBank, which was Oldfield's bank. Groob and Bowie met with Michael Kennedy, a vice president of KeyBank, and Carol Sapinsley, another vice president and a loan officer, to discuss financing. Groob and Bowie asserted that after hearing their proposal, Sapinsley had congratulated the pair for finding "the goose that laid the golden egg."

{¶ 6} But the Groobs and Bowie would enjoy neither goose nor golden egg as a result of their dealings with KeyBank. Sapinsley called Groob several days after their meeting to inform him that the bank was not interested in making a loan to him for the purchase of Oldfield. Groob and Bowie then made several more unsuccessful attempts to negotiate with Scheve before finally giving up on the purchase.

{¶ 7} Sapinsley was to have much greater success in purchasing Oldfield. Soon after the meeting with Groob and Bowie, Sapinsley began discussing the purchase of Oldfield with Clark Sarver, a KeyBank customer. And within six days of the meeting with Groob and Bowie, Sapinsley and Sarver sent Scheve an offer similar to the Groob proposal to buy Oldfield. Scheve accepted their offer.

{¶ 8} Groob did not discover that Sapinsley had purchased Oldfield until nearly two years later. He saw Scheve's obituary in the newspaper and noticed that Sapinsley and Sarver were identified as Oldfield's new owners. Groob immediately sent a letter to Martin Piazza, the local president of KeyBank, concerning Sapinsley's actions. Piazza did not respond. Groob then sent another letter to Jack Kopnisky, president of KeyCorporation. Kopnisky also did not respond.

{¶ 9} The Groobs and Bowie sued Sapinsley and Key, alleging tortious interference with a business opportunity, breach of fiduciary duty, breach of an implied contract, and negligence. The trial court directed a verdict for all defendants on the breach-of-fiduciary-duty claim and for Key on the negligence claim. The jury

found for Key on the issue of respondeat superior. But the jury found Sapinsley liable on several of the claims and awarded damages of $556,020; as a result of a subsequent settlement agreement, Sapinsley is not a party to this appeal.

## II. The Appeal

{¶ 10} The Groobs and Bowie now raise five assignments of error, arguing that the trial court erred by (1) directing a verdict in favor of KeyBank and KeyCorporation and refusing to instruct the jury on fiduciary duty; (2) instructing the jury that KeyBank was not liable for its employee's intentional acts if those acts in no way facilitated or promoted Key's business; (3) failing to instruct the jury that it could find KeyBank liable based on ratification; (4) directing a verdict in favor of Key on the issue of negligence; and (5) excluding the expert testimony of James Beggs. The first, second, and third assignments also assert that the trial court erred in denying the Groobs' and Bowie's motions for judgment notwithstanding the verdict and a new trial.

## III. Duty to Loan Applicants

{¶ 11} The trial court directed a verdict in favor of Key on the issue of fiduciary duty. The Groobs and Bowie now argue that the trial court erred by directing a verdict on this issue, by refusing to instruct the jury, and by denying their motions for judgment notwithstanding the verdict and a new trial.

{¶ 12} The standard of review of a judgment of directed verdict and a judgment against a motion for judgment notwithstanding the verdict is virtually the same.[1] A directed verdict is proper when, construing the evidence in favor of the nonmoving party, reasonable minds can come only to a conclusion adverse to that party.[2] We review the grant of a directed verdict de novo.[3] Where there is sufficient substantive evidence to allow reasonable minds to reach different conclusions, the court should deny a motion for judgment notwithstanding the verdict.[4] And a court may grant a new trial where the underlying decision is the result of an error of law.[5]

---

**1.** *Howell v. Dayton Power & Light Co.* (1995), 102 Ohio App.3d 6, 656 N.E.2d 957.

**2.** Civ.R. 50(A)(4).

**3.** *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835.

**4.** Id.

**5.** Civ.R. 59(A)(9).

{¶ 13} The relationship of debtor and creditor is ordinarily not a fiduciary relationship.[6] A bank and its customers stand at arm's length when negotiating the terms and conditions of a loan.[7] But a fiduciary relationship may arise from a particular relationship where both parties understand that a special trust or confidence exists between them.[8] And one who owes a duty to a third person cannot escape responsibility if his agent fails to perform that duty, even where that failure is willful or the result of malice.[9]

{¶ 14} This is a case of first impression in Ohio. We have been unable to find any cases in which loan officers or banks took confidential information from a prospective loan applicant and used it for their own benefit. Thankfully, this situation is rare—most loan officers do not hijack customers' business opportunities. But the Ohio Supreme Court has imposed a fiduciary duty on loan officers and banks in a situation that was less egregious than what occurred here.

{¶ 15} In *Stone v. Davis*,[10] the Ohio Supreme Court held that a lending institution must advise a loan applicant how to secure mortgage insurance. This duty of disclosure arose because of the lender's superior position and its pecuniary interest in the loan-application process.[11] Whether a duty exists depends on the facts of each individual case.[12] While the current case does not involve a question of disclosure, Sapinsley and Key shared an equally superior position with the lenders in *Stone*, and Sapinsley used that position for her own financial benefit.

{¶ 16} The Ohio Supreme Court has held that a bank's giving advice to a loan applicant at arm's length does not create a fiduciary relationship.[13] But Groob and Bowie gave Sapinsley and KeyBank the due-diligence information that Groob had prepared. Surely Groob and Bowie did not expect Key or Sapinsley to use

---

6. *Umbaugh Pole Bldg. Co., Inc. v. Scott* (1979), 58 Ohio St.2d 282, 390 N.E.2d 320.

7. *Blon v. Bank One, Akron, N.A.* (1988), 35 Ohio St.3d 98, 519 N.E.2d 363.

8. *Umbaugh Pole Bldg. Co., Inc. v. Scott*, 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320; *Applegate v. Fund for Constitutional Govt.* (1990), 70 Ohio App.3d 813, 592 N.E.2d 878.

9. *Stranahan Bros. Catering Co. v. Coit* (1896), 55 Ohio St. 398, 45 N.E. 634.

10. *Stone v. Davis* (1981), 66 Ohio St.2d 74, 20 O.O.3d 64, 419 N.E.2d 1094.

11. Id.; see, also, *Anchor Savings Assn. v. Wilkin* (June 13, 1983), 4th Dist. No. 480, 1983 WL 3187.

12. Id.

13. *Umbaugh Pole Bldg. Co., Inc. v. Scott*, 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320.

that information to purchase Oldfield. And surely Key was aware of this special trust and confidence.

{¶ 17} Other jurisdictions have dealt with situations where a bank or its employees misused the confidential information of a prospective loan applicant. Those courts held that the lender owed a special confidential or fiduciary duty to the loan applicant.

{¶ 18} In *Djowharzadeh v. City Natl. Bank & Trust Co.*,[14] the wives of the president and chairman of the prospective lending bank bought property for which a prospective applicant had tried to secure a loan. The Oklahoma court of appeals held that the bank and its officers owed a duty of confidentiality to the prospective customer.[15] The court stated that the relationship between a loan applicant and the bank goes "beyond mere matters of courtesy." [16]

{¶ 19} The customer has the duty to disclose his assets, personal credit history, past conduct, future plans, and other highly personal information—and the customer cannot receive a loan unless he complies with his disclosure obligations.[17] If banks could misappropriate every applicant's ideas, "[s]uch a policy would soon destroy [banks'] public usefulness and benefit neither the public, nor, ultimately, the banking industry." [18] Since the customer must disclose personal information to the bank, there is a resulting position of superiority. Thus, there must be a special duty imposed on the bank to counterbalance its position.[19]

{¶ 20} As the Oklahoma court held, "One goal of this system [of banking] is to assure that banks do not compete financially with their customers, but rather serve public financial needs fairly and evenly. Implicit in this policy of fair dealing and evenhandedness is a requirement that banks not use their favored position to the detriment of their customers, either directly or indirectly." [20]

{¶ 21} A similar result was reached in *Pigg v. Robertson*.[21] Pigg went to a bank to secure a loan to purchase a farm. He had conducted business with the

---

14. *Djowharzadeh v. City Natl. Bank & Trust Co.* (Okla.App.1982), 646 P.2d 616.

15. Id.

16. Id. at 619.

17. Id.

18. Id.

19. Id.

20. Id.

21. *Pigg v. Robertson* (Mo.App.1977), 549 S.W.2d 597.

bank on prior occasions and asked to see the bank president. But the president was out of town. The teller directed Pigg to Robertson, who was not an employee of the bank but was sitting in the president's office. Coincidentally, Robertson was considering purchasing the same farm. Robertson listened to Pigg's proposal and told him to come back when the president returned. Robertson called the real estate agent for the farm later that day and executed a contract of sale. The Missouri court of appeals held that there was enough evidence that a confidential relationship could have been found, so the trial court should not have directed the verdict.[22]

{¶ 22} Following the logic of *Djowharzadeh, Pigg,* and similar cases,[23] we conclude that a special duty of confidentiality exists between a loan applicant and the prospective lender. Banks or loan officers cannot use information obtained from loan applicants for their own benefit. Key therefore had a special duty of confidentiality to Groob and Bowie. "This duty has existed traditionally and continues to exist, if not specifically in the law books, at least in the mind of the public in general and within the banking community in particular." [24]

{¶ 23} This duty should not be viewed broadly. In all of its prior jurisprudence, Ohio has not seen a case that required the imposition of such a duty. But as the *Djowharzadeh* court recognized, the duty of confidentiality has been traditionally recognized in the banking industry. Our imposition of a duty of confidentiality here is merely an affirmation of what is already standard banking practice.

{¶ 24} We cannot say that reasonable minds could come only to the conclusion that Key owed no duty to the Groobs and Bowie. The trial court's granting a directed verdict on this point was therefore an error of law.

{¶ 25} We accordingly sustain the first assignment of error. The Groobs and Bowie are entitled to a trial on their claim for breach of a fiduciary duty.

## IV. Respondeat Superior

{¶ 26} The second assignment of error asserts that the trial court improperly instructed the jury on the issue of respondeat superior and that the trial court erred by denying the Groobs' and Bowie's motions for judgment notwithstanding the verdict and a new trial.

---

22. Id.

23. See, e.g., *Jordan v. Shattuck Natl. Bank* (C.A.10, 1989), 868 F.2d 383; *Dolton v. Capitol Fed. S. & L. Assn.* (Colo.App.1981), 642 P.2d 21.

24. *Djowharzadeh,* 646 P.2d at 620.

{¶ 27} Jury instructions are proper if they correctly state the law as applied to the facts of the case, and if reasonable minds can properly reach the conclusion sought by the instructions.[25]

{¶ 28} An appellant may not challenge a jury instruction unless a specific objection was raised prior to deliberations.[26] Key argues that the Groobs and Bowie failed to object to the jury instructions in question. But trial counsel had filed proposed jury instructions. And at the proper time he noted on the record that the trial court should have used his instructions. This was the proper procedure.

{¶ 29} We have established that a special duty existed. But we must now determine whether Key could have been held liable for Sapinsley's misappropriation of the loan information.

{¶ 30} Liability based on an agency relationship arises where (1) the defendant induces the plaintiff to believe that the wrongdoer is operating as the defendant's agent, and (2) the plaintiff relies on the agency relationship to his detriment.[27]

{¶ 31} The doctrine of respondeat superior holds an employer liable for its employee's torts committed in the scope of employment.[28] If the tort is intentional, the employer is generally not liable unless the employee's behavior is calculated to facilitate or promote the employer's business.[29] "[A]n intentional and willful act committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from his employment and his principal or employer is not responsible therefor." [30]

{¶ 32} But an exception occurs when the agent's misconduct is not a result of unrelated intentional conduct—that is, when the agent's position enables her to commit the tort.[31]

---

25. *Cincinnati Gas & Elec. Co. v. Joseph Chevrolet Co.*, 153 Ohio App.3d 95, 2003-Ohio-1367, 791 N.E.2d 1016.

26. *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 24 O.O.3d 316, 436 N.E.2d 1001.

27. *Linder v. Am. Natl. Ins. Co.*, 155 Ohio App.3d 30, 2003-Ohio-5394, 798 N.E.2d 1190, citing *Shaffer v. Maier* (1994), 68 Ohio St.3d 416, 627 N.E.2d 986.

28. Id., citing Restatement of the Law 2d, Agency (1958), Section 219(1); *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 587 N.E.2d 825.

29. Id.

30. *Vrabel v. Acri* (1952), 156 Ohio St. 467, 474, 103 N.E.2d 564.

31. *Buckeye Union Ins. Co. v. SCOA Indus., Inc.* (Feb. 4, 1975), 10th Dist. No. 74AP–247; *Hammons v. Jackson* (June 22, 1995), 10th Dist. No. 94APE12–1736, 1995 WL 373509;

{¶ 33} The Restatement of the Law of Agency states, "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." [32] And "[a] master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless * * * he was aided in accomplishing the tort by the existence of the agency relation." [33]

{¶ 34} Under these circumstances, the principal is subject to liability even though the principal was entirely innocent and received no benefit from the transaction and the agent acted solely for her own purposes. [34] Liability is based on the fact that the agent's position facilitates the consummation of the fraud. [35] The transaction appears regular to third parties. [36] And the agent appears to be acting in the ordinary course of business in accepting confidential information. But when the agent breaches that trust, the principal is liable for its agent's actions. The principal is liable for its agent's acts if the acts can reasonably be deemed to be an ordinary and natural incident of the service to be rendered. [37]

{¶ 35} As with the duty of confidentiality, this principle should not be viewed broadly. A principal should be responsible for acts of its agent committed under the guise of that agent's authority. But this rule of law should not apply where the agent uses her position to gain the trust of third parties and then uses that trust to commit some other fraud upon those parties. It is the agent's acting as if she were performing her duty that creates liability for the principal.

{¶ 36} In *Oakley Bldg. & Loan Co. v. Murphy*,[38] the cashier of a building and loan association accepted some currency from a depositor. The cashier agreed to hold the currency for safekeeping but later embezzled some of the money. The

---

*Gibson v. Fed. Express Corp.* (Jan. 12, 2001), 2d Dist. No. 18406, 2001 WL 28668; Restatement of the Law 2d, Agency (1958), Section 261; see, also, id. at Section 219(2)(d).

32. Id. at Section 261.

33. Id. at Section 219.

34. Comment *a* to Restatement of the Law 2d, Agency, Section 261; *Fahey Banking Co. v. Adams* (1994), 98 Ohio App.3d 214, 648 N.E.2d 68; *DeSantis v. Smedley* (1986), 34 Ohio App.3d 218, 517 N.E.2d 1038.

35. Comment *a* to Restatement of the Law 2d, Agency, Section 261.

36. Id.

37. *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 74 O.O.2d 427, 344 N.E.2d 334.

38. (1948), 84 Ohio App. 539, 40 O.O. 26, 84 N.E.2d 749.

court held that accepting deposits was incidental to the business of banking and that the principal was therefore bound by the cashier's acts. The principal was thus liable on the terms agreed to by the cashier because the cashier was acting within the apparent scope of his authority when he accepted the money.

{¶ 37} In *Buckeye Union Ins. Co. v. SCOA Industries, Inc.,*[39] an employee of a bookkeeping service inserted his personal account numbers on deposit slips rather than the clients' account numbers. He received a credit to his account for each deposit as a result of this fraud. The employee was acting on behalf of his principal when endorsing the checks, filling out the deposit slips, and making the deposits.[40] He performed the services that he was authorized to perform—albeit in a fraudulent manner—on behalf of his principal by forging account numbers.[41] The Tenth Appellate District held that it was a question for the jury whether the employer was liable for the employee's fraudulent actions that were facilitated by his position as an agent.[42] In fact, the jury apparently had found during the trial that the employee's fraudulent acts were not a sufficient deviation from his scope of employment to free the employer from responsibility.[43]

{¶ 38} Twenty years after *Buckeye,* the Tenth Appellate District followed the same logic where an employee of a bank had accepted money from his relatives to pay back part of the money he had embezzled from the bank.[44] The court cited the proposition that a principal is liable where it puts its agent in a position to deceive third parties while apparently acting within his authority.[45] The court held that the bank was not liable for its employee's actions, but only because there was no evidence that his asking his relatives for money amounted to acting as the bank's agent.

{¶ 39} The question remains whether the Groobs' and Bowie's loss occurred from not receiving the loan or from Sapinsley's actual purchase of Oldfield, or both. Though Sapinsley testified that the transaction was all just a coincidence, the jury evidently believed that Sapinsley turned down the loan, hijacked the information, and purchased Oldfield. It was a question of fact for the jury

39. *Buckeye Union Ins. Co. v. SCOA Industries, Inc.* (Feb. 4, 1975), 10th Dist. No. 74AP–247.

40. Id.

41. Id.

42. Id.

43. Id.

44. *Hammons v. Jackson* (June 22, 1995), 10th Dist. No. 94APE12–1736, 1995 WL 373509.

45. Id.

whether Sapinsley was aided in accomplishing the tort by her position as Key's agent.[46] If these things could not have happened absent Sapinsley's position with KeyBank, then the jury was entitled to find for the Groobs and Bowie on this issue. The trial court's instructions to the jury on respondeat superior, however, stated the following:

{¶ 40} "An employer is not liable for damages to a third party caused by the act or acts of an employee performed intentionally and solely for the employee's own purposes which in no way facilitate or promote the employer's business.

{¶ 41} "You may find the employer liable if you find by the greater weight of the evidence that the intentional act was done wholly or in part for the benefit of the employer and not solely for the employee's benefit."

{¶ 42} The trial court's instructions failed to advise the jury of Key's possible liability if Sapinsley was aided in her fraud by her status as a loan officer. The Groobs and Bowie submitted a revised jury instruction that stated the law more accurately. The proposed instruction provided, "If you find that [Sapinsley] was aided in her wrongful interference by her status as a loan officer at KeyBank[,] then you must find for the Plaintiffs and against Defendant KeyBank." This was exactly the Restatement standard. And requested instructions should be given if they are correct statements of the law applicable to the facts in the case and reasonable minds might reach the conclusion sought by the instructions.[47] This instruction should have been given.

{¶ 43} Under the trial court's instruction, reasonable minds could come only to the conclusion that Key was not liable for Sapinsley's intentional torts. This instruction incorrectly stated the law by ignoring the Restatement standard and was therefore erroneous. We must therefore sustain the second assignment.

### V. Jury Instruction on Ratification

{¶ 44} The third assignment of error asserts that the trial court negligently failed to instruct the jury on the issue of ratification. The Groobs and Bowie further argue that the trial court erred by denying the Groobs' and Bowie's motions for judgment notwithstanding the verdict and a new trial on these grounds.

{¶ 45} This is a lame argument. There was no evidence to support a jury instruction on ratification. And a trial court should not instruct the jury

---

46. See *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 587 N.E.2d 825; Restatement of the Law 2d, Agency, Section 219(2)(d).

47. *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 575 N.E.2d 828.

where there is no evidence to support the issue.[48]

{¶ 46} Ratification of a contract or other act is implied where the principal accepts and retains the benefits of the act, recognizes it as binding, or acquiesces in it.[49] There was no evidence in this case that Key benefited from Sapinsley's actions. Key actually *lost* business because not only did Groob and Bowie not receive a loan, but Sapinsley secured a loan from a different bank to finance her purchase of Oldfield. While there was evidence in the record that certain Key employees may have known about Sapinsley's new business venture, there was nothing to suggest that Key ratified Sapinsley's conduct in any way. Groob's letters to Key asking for a reply and assistance and Key's subsequent silence did not amount to a ratification of Sapinsley's intentional tort. Therefore, no instruction on ratification was necessary, nor would one have been proper.

{¶ 47} We therefore overrule the third assignment of error.

## VI.   Negligence

{¶ 48} The fourth assignment of error asserts that the trial court erred in directing a verdict on negligence. The Groobs and Bowie argue that Key negligently failed to satisfy its own internal rules designed to prevent employees from misusing customers' confidential information.

{¶ 49} As we have already stated, a directed verdict is proper when, construing the evidence in favor of the nonmoving party, reasonable minds can come only to a conclusion adverse to that party.[50]

{¶ 50} The Groobs and Bowie did not present any evidence concerning the standard of care for a bank when enforcing its own code of ethics. As the trial court noted, the jury would have had to speculate on this issue. This would have been improper. Thus, reasonable minds could have come only to the conclusion that the Groobs and Bowie had failed to prove a case of negligence against Key. The directed verdict was proper on this claim.

{¶ 51} We therefore overrule the fourth assignment of error.

## VII.   Expert Testimony

{¶ 52} The Groobs' and Bowie's fifth assignment of error argues that the trial court erroneously excluded James Beggs's expert testimony.

---

48.   *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 575 N.E.2d 828.

49.   *Campbell v. Hospitality Motor Inns, Inc.* (1986), 24 Ohio St.3d 54, 24 OBR 135, 493 N.E.2d 239.

50.   Civ.R. 50(A)(4).

{¶ 53} The admission of expert testimony is within the discretion of the trial court.[51]  We cannot alter the trial court's decision absent an abuse of that discretion.[52]

{¶ 54} The trial transcript reflects that Beggs's testimony was admitted into evidence, but his deposition was not among the trial exhibits, nor was it on the exhibit list.  Beggs may have qualified as an expert witness under Evid.R. 703.  But the trial court excluded his testimony because the testimony was based on data obtained from the Internet.  We cannot say that this was an abuse of discretion.

{¶ 55} We therefore overrule the fifth assignment of error.

## VIII.  Remand

{¶ 56} Accordingly, we affirm the trial court's judgment in part and reverse it in part.  We remand the case for a new trial on the issues of Key's duty of confidentiality and respondeat superior and for the trial court to give jury instructions consistent with this opinion.

Judgment affirmed in part,
reversed in part
and cause remanded.

HILDEBRANDT, P.J., and WINKLER, J., concur.

---

51.  *Vargo v. Travelers Ins. Co.* (1987), 34 Ohio St.3d 27, 516 N.E.2d 226.

